1   **WO**

2

3

4

5

6                     **IN THE UNITED STATES DISTRICT COURT**

7                         **FOR THE DISTRICT OF ARIZONA**

8

9   Robert Allen Poyson,                    )
                                            )        No. CV 04-0534-PHX-NVW
10              Petitioner,                  )
                                            )        <u>DEATH PENALTY CASE</u>
11  vs.                                      )
                                            )
12                                           )        **MEMORANDUM OF DECISION**
                                            )        **AND ORDER**
13  Charles L. Ryan, et al.,[1]             )
                                            )
14              Respondents.                 )
    _____ )
15

16          Petitioner Robert Poyson, a state prisoner under sentence of death, has filed an

17  Amended Petition for Writ of Habeas Corpus. (Dkt. 27.)[2] Petitioner alleges, pursuant to 28

18  U.S.C. § 2254, that he is imprisoned and sentenced in violation of the United States

19  Constitution.  Also before the Court is Petitioner's second motion to expand the record.

20  (Dkt. 72.)  For the reasons set forth below, the Court concludes that Petitioner is not entitled

21  to habeas relief or expansion of the record.

22                              **<u>BACKGROUND</u>**

23          A jury convicted Petitioner on three counts of first degree murder, one count of

24  conspiracy to commit first degree murder, and one count of armed robbery.  The following

25  facts concerning the crimes are taken from the decision of the Arizona Supreme Court

26  _____

27          [1]      Charles L. Ryan, Interim Director of the Arizona Department of Corrections,
    is substituted as Respondent pursuant to Federal Rule of Civil Procedure 25(d).

28          [2]      "Dkt." refers to the documents in this Court's case file.

affirming Petitioner's convictions and sentences, *State v. Poyson*, 198 Ariz. 70, 74, 7 P.3d 79, 83 (2000), and from this Court's review of the record.

Petitioner met Leta Kagen, her 15-year-old son, Robert Delahunt, and Roland Wear in April of 1996. Petitioner was 19 years old and homeless. Kagen allowed him to stay with her and the others at their trailer in Golden Valley, near Kingman, Arizona. In August of the same year, Kagen was introduced to 48-year-old Frank Anderson and his 14-year-old girlfriend, Kimberly Lane. They also needed a place to live, and Kagen invited them to stay at the trailer.

Anderson informed Petitioner that he was eager to travel to Chicago, where he claimed to have connections to the mafia. Because none of them had a way of getting to Chicago, Anderson, Petitioner, and Lane formulated a plan to kill Kagen, Delahunt, and Wear in order to steal Wear's truck.

On the evening of August 13, 1996, Lane lured Delahunt into a small travel trailer on the property. There, Anderson attacked Delahunt, slitting his throat with a bread knife. Petitioner heard Delahunt's screams and ran to the trailer. While Anderson held Delahunt down, Petitioner bashed his head against the floor. He also beat the victim's head with his fists and pounded it with a rock. This did not kill Delahunt, so Petitioner took the bread knife and, using a rock as a hammer, drove it through Delahunt's ear. Although the blade penetrated the victim's skull and exited through his nose, the wound was not fatal. Petitioner continued to slam Delahunt's head against the floor until he lost consciousness. According to the medical examiner, Delahunt died of massive blunt force head trauma. The attack lasted about 45 minutes.

After cleaning themselves up, Petitioner and Anderson prepared to kill Kagen and Wear. They first located Wear's .22 caliber rifle. Unable to find any ammunition, Petitioner borrowed two rounds from a young girl who lived next door, telling her that Delahunt was in the desert surrounded by snakes and the bullets were needed to help rescue him. Petitioner loaded the rifle and tested it to make sure it would function properly. He then stashed it near

- 2 -

a shed.  Later that evening, he cut the telephone line to the trailer so that neither of the remaining victims could call for help.

After Kagen and Wear were asleep, Petitioner and Anderson went into their bedroom. Petitioner first shot Kagen in the head, killing her instantly.  After reloading the rifle, he shot Wear in the mouth, shattering his upper right teeth.  A struggle ensued, during which Petitioner repeatedly clubbed Wear in the head with the rifle.  The altercation eventually moved outside.  At some point, Anderson threw a cinder block at Wear, hitting him in the back and knocking him down.  While the victim was lying on the ground, Petitioner kicked him in the head.  He then picked up the cinder block and threw it several times at Wear's head.  When Wear stopped moving, Petitioner took his wallet and the keys to his truck. Petitioner covered the body with debris from the yard.  Petitioner, Anderson, and Lane then took the truck and drove to Illinois, where they were apprehended several days later.

The trial court sentenced Petitioner to death for the murders, and to terms of imprisonment for the other offenses.  Following his unsuccessful direct appeal, Petitioner filed a petition for certiorari, which was denied.  *Poyson v. Arizona*, 531 U.S. 1165 (2001). In 2002, Petitioner filed in state court a petition for post-conviction relief (PCR) and a supplemental petition pursuant to Rule 32 of the Arizona Rules of Criminal Procedure.  (Dkt. 31, Ex. J.)  The PCR court denied relief without holding an evidentiary hearing.[3]  (Dkt. 32, Ex. N.)  In March 2004, the Arizona Supreme Court summarily denied a petition for review. (*Id.*, Ex. S.)  Thereafter, Petitioner initiated the instant habeas proceedings.

## APPLICABLE LAW

Because it was filed after April 24, 1996, this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254 (AEDPA).  *Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *see also Woodford v. Garceau*, 538 U.S. 202, 210 (2003).

---

[3]     Judge Steven F. Conn, of the Mohave County Superior Court, presided over Petitioner's trial and the PCR proceedings.

For properly exhausted claims, the AEDPA established a "substantially higher threshold for habeas relief" with the "acknowledged purpose of 'reducing delays in the execution of state and federal criminal sentences.'" *Schriro v. Landrigan*, 550 U.S. 465, 475 (2007) (quoting *Woodford v. Garceau*, 538 U.S. 202, 206 (2003)). The AEDPA's "'highly deferential standard for evaluating state-court rulings' . . . demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997)).

Under the AEDPA, a petitioner is not entitled to habeas relief on any claim "adjudicated on the merits" by the state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The relevant state court decision is the last reasoned state decision regarding a claim. *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)).

"The threshold question under AEDPA is whether [a petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." *Williams v. Taylor*, 529 U.S. 362, 390 (2000). Therefore, to assess a claim under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review. "Clearly established" federal law consists of the holdings of the Supreme Court at the time the petitioner's state court conviction became final. *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 549 U.S. 70, 76 (2006). Habeas relief cannot be granted if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner, even if lower federal courts have decided the issue. *Williams*, 529 U.S. at 381; *see Musladin*, 549 U.S. at 77. Nevertheless, while only Supreme Court authority is binding, circuit court precedent may be

"persuasive" in determining what law is clearly established and whether a state court applied that law unreasonably. *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).

The Supreme Court has provided guidance in applying each prong of § 2254(d)(1). The Court has explained that a state court decision is "contrary to" the Supreme Court's clearly established precedents if the decision applies a rule that contradicts the governing law set forth in those precedents, thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter of law, or if it confronts a set of facts that is materially indistinguishable from a decision of the Supreme Court but reaches a different result. *Williams*, 529 U.S. at 405-06; *see Early v. Packer,* 537 U.S. 3, 8 (2002) (per curiam). In characterizing the claims subject to analysis under the "contrary to" prong, the Court has observed that "a run-of-the-mill state-court decision applying the correct legal rule to the facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams*, 529 U.S. at 406.

Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407. For a federal court to find a state court's application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner must show that the state court's decision was not merely incorrect or erroneous, but "objectively unreasonable." *Id.* at 409; *Visciotti*, 537 U.S. at 25.

Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state court decision was based on an unreasonable determination of the facts. *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (*Miller-El II*). A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El I*, 537 U.S. at 340;

- 5 -

*see Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004). In considering a challenge under 2254(d)(2), state court factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Miller-El II*, 545 U.S. at 240. However, it is only the state court's factual findings, not its ultimate decision, that are subject to § 2254(e)(1)'s presumption of correctness. *Miller-El I*, 537 U.S. at 341-42.

## **DISCUSSION**

Nineteen of Petitioner's habeas claims remain before this Court.[4] Respondents contend that six of the claims – Claims 4, 8, 15, 16, 19, and 21 – are procedurally defaulted. The Court finds it unnecessary to address the procedural status of these claims, as they are plainly meritless and will be dismissed for the reasons set forth below. *See* 28 U.S.C. § 2254(b)(2) (allowing denial of unexhausted claims on the merits); *Rhines v. Weber*, 544 U.S. 269, 277 (2005).

**Claims 2 and 3**

In Claim 2, Petitioner alleges that his death sentences were unconstitutionally imposed because at the time of sentencing Arizona law required a defendant to establish a causal connection between the proffered mitigating evidence and the crime. (Dkt. 27 at 39.) In Claim 3, Petitioner alleges that the trial court violated his constitutional rights by failing to consider his mitigating evidence. (*Id.* at 44.)

Respondents concede that Claim 3 is exhausted. They contend that Claim 2 is exhausted only to the extent it was raised on direct appeal, where Petitioner argued that the trial court erred in failing to find a connection between the crimes and mitigating evidence with respect to Petitioner's mental health and dysfunctional family background. (Dkt. 31,

---

[4] In a prior order denying Petitioner's Motion for Discovery and Evidentiary Hearing and his First Motion to Expand the Record, the Court dismissed Claims 5-C, 5-D, 6, and 22 as procedurally barred and Claims 1 and 21 as meritless. (Dkt. 54.)

Ex. B at 29, 31.) However, since that is the substance of the allegations in Claim 2, the Court finds the claim exhausted and will consider it on the merits.

Background

    *1.   Trial court*

In his sentencing memorandum, defense counsel proffered three statutory and 24 nonstatutory mitigating factors, including circumstances related to Petitioner's mental health, substance abuse, and abusive childhood. (ROA doc. 118.)[5] Attached to the memorandum were articles addressing prenatal exposure to drugs and alcohol. (*Id.*) Counsel also submitted a psychological evaluation prepared by Dr. Celia Drake. (Dkt. 32, Ex. T.) Dr. Drake noted factors in Petitioner's life that predisposed him to substance abuse, delinquency, and crime. (*Id.*) These included a chaotic home environment with no consistent father figure, childhood neglect, physical abuse, sexual assault, and a possible genetic link through his biological father. (*Id.* at 21-22.) Dr. Drake diagnosed Petitioner with adjustment disorder with depressed mood, mild intensity; antisocial personality disorder; alcohol abuse; and polysubstance dependence. (*Id.* at 20.)

At the presentence hearing, the defense called three witnesses: Petitioner's mother, his aunt, and Blair Abbott, a mitigation investigator. (RT 11/20/98.) Their testimony indicated that Petitioner never knew his biological father. (*Id.* at 31-32, 129.) Petitioner was raised by his mother and a series of stepfathers, some of whom drank and used drugs and were physically abusive and one of whom, Petitioner's favorite, committed suicide when

---

    [5]   "ROA doc." refers to the two-volume Record on Appeal containing consecutively-numbered pleadings prepared by the Clerk of the Mohave County Superior Court for Petitioner's direct appeal to the Arizona Supreme Court (Case No. CR-98-0510-AP). "PCR-ROA" refers to the four-volume Post-Conviction Record on Appeal prepared by the Clerk of the Mohave County Superior Court for the petition for review to the Arizona Supreme Court from the denial of the PCR petition (Case No. CR-03-0084-PC). "M.E." refers to a one-volume set of Minute Entries prepared by the Clerk of the Mohave County Superior Court for the direct appeal to the Arizona Supreme Court. "RT" refers to the reporter's trial transcript. The original trial transcripts and certified copies of the state court records were provided to this Court by the Arizona Supreme Court. (*See* Dkt. 36.)

Petitioner was 10 or 11. (*Id.* at 35-47, 50.) Petitioner's mother drank and used drugs during the first three months of her pregnancy. (*Id.* at 27-29, 132.) Shortly after his stepfather's suicide, Petitioner was sexually abused by an acquaintance. (*Id.* at 138.) Thereafter, Petitioner's behavior deteriorated; he began abusing alcohol and drugs, skipping school, and getting into trouble with the law. (*Id.* at 54, 60, 105,142-43.) The testimony also indicated that Petitioner was developmentally delayed and suffered head injuries and fainting spells. (*Id.* at 51, 119,143-45.) Abbott testified that Petitioner told him he had used PCP two days prior to the murders and that he experienced a flashback while he was killing Delahunt. (*Id.* at 149-50.) He also reported using alcohol the night before the murders and marijuana that morning. (*Id.*)

In sentencing Petitioner, the trial court found that the State proved three aggravating factors beyond a reasonable doubt: that each of the murders was committed in expectation of pecuniary gain, pursuant to A.R.S. § 13-703(F)(5); that the murders of Delahunt and Wear were especially cruel under § 13-703(F)(6); and that Petitioner was convicted of multiple homicides committed during the same offense under § 13-703(F)(8). The court found that Petitioner failed to prove any statutory mitigating factors and proved only one nonstatutory mitigating circumstance, his cooperation with the police.

With respect to A.R.S. § 13-703(G)(1), which establishes a mitigating factor based on impairment of a defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law, the trial court made the following findings:

> There has certainly been evidence that the defendant has gone through a turbulent life, perhaps had mental-health issues that would distinguish him from the typical person on the street.
>
> Listening to his description of how these murders were committed, based upon a description of somewhat a methodical carrying out of a plan, the Court sees absolutely nothing in the record, in this case, to suggest the applicability of this mitigating circumstance.

(RT 11/20/98 at 48-49.)

With respect to age as a mitigator under § 13-703(G)(5), the court described its

application of the factor as "a little more problematic." (*Id.* at 50.) The court explained:

> The defendant was 19 at the time. I am certain that both sides can cite cases in support of their respective positions for people around this same age in which this was found a mitigating factor or people around the same age for which this was not found a mitigating factor.
>
> I think the one thing that cases make it clear is that age is not just a number that we look at. We don't plug the number into some computer. If it's below a certain amount, it's mitigation; if it's above a certain amount, it's not mitigation.
>
> The issue is not how young or old a person is but what connection there may be with their age and the behavior that they engaged in. The defendant was relatively young, chronologically speaking.
>
> As far as the criminal justice system goes, he was not so young. He had been part of that system for some period of time. He was no longer living at home. He had effectively been emancipated for a period of time. He was working on at least a sporadic basis, and there are certainly no questions in this case as to what the defendant's age was, but I do not find his age to have been a mitigating circumstance under the circumstances of this case.

(*Id.* at 50-51.)

The court then turned to nonstatutory mitigation, first explaining its approach to analyzing such information:

> what I have attempted to do . . . is to sort of engage in a two-part analysis . . . and that is to analyze whether the defense has shown this fact by a preponderance of the evidence, and then if they have, to determine whether I would assign that any weight as a mitigating factor, and of course, for any . . . that pass both of those tests, I have to weigh them all along with the other factors in the final determination of this case.

(*Id.* at 52.)

The court proceeded to discuss in detail the nonstatutory mitigating circumstances proffered by Petitioner, including his mental health, family background, remorse, and substance abuse issues. With respect to proffered mitigation concerning Petitioner's mental health and intelligence, the court found:

> Again, the defendant had some mental health and psychological issues. I think, depending on what you define a mental or personality disorder to be, . . . the defense has established that there were certain men – personality disorders that the defendant, in fact, may have been suffering from.
>
> The Court, however, does not find that they rise to the level of being a mitigating factor because I am unable to draw any connection whatsoever with

- 9 -

such personality disorders and the commission of these offenses.

So, the Court finds that the defense has failed to establish, by a preponderance of the evidence, that the personality disorders of the defendant were a nonstatutory mitigating factor.

. . . .

The defense has also argued, as a nonstatutory mitigating factor, the defendant's diminished mental capacity and his low I.Q., and this – this may, to some extent, be incorporated within one of the statutory factors, but there is nothing to prevent me from discussing a fine variation of that as a possible nonstatutory mitigating factor.

The Court would concede that there is certain evidence in this case that would support the proposition that the defendant's mental capacity may be diminished, at least compared to the norm in the population, and that his I.Q. may be low, at least compared to the norm in the population.

However, when you weigh that against the defendant's description of the murders, certain preparatory steps that were taken – admittedly, not overly-sophisticated, but attempts were made to do certain things, to disable warning systems to enable these murders to be committed and to get away with the loot that was the purpose of the murders; specifically, the vehicle.

The Court finds that even though there is evidence that the defendant may have a diminished mental capacity and a lower-than-average I.Q., that the defense has failed to establish, by a preponderance of the evidence, the nonstatutory factor of the defendant's diminished capacity and low I.Q.

(*Id.* at 52-53, 56-57.)

The court then considered aspects of Petitioner's childhood and family background as mitigating evidence:

I was certainly struck, at the presentencing hearing, by the fact that Mr. Poyson had a childhood that I certainly would not have wanted to have been a part of and would not have wanted my children to be a part of or anyone that I know.

I can think of people that I know who have been abused as children, who have had parents die when they were young, who have been exposed to separation and anxiety that would certainly be comparable to that that was suffered by Mr. Poyson, and I can think of people who have gone through things remarkably similar to Mr. Poyson and have become productive upstanding members of the community, and I am finding that [the] defense has shown that defendant suffered a dysfunctional childhood, that he was subjected to physical and sexual abuse, and that he was subjected to certain levels of mental abuse.

The Court finds absolutely nothing in this case to suggest that his latter conduct was a result of his childhood.

The Court finds that the defense has failed to establish, by a preponderance of the evidence, the nonstatutory mitigating factors of his dysfunctional family and child background, the physical and sexual abuse in his childhood or the mental abuse in his childhood.

. . . .

As far as childhood neglect is concerned, that would be the same as the finding I made earlier concerning certain levels [sic] of his childhood. The defense has shown, by a preponderance of the evidence, that the defendant was subjected to neglect in his childhood, but have failed to show, by a preponderance of the evidence, that that would be a mitigating factor.

. . . .

Family tragedy. It is certainly easy, I'm sure for someone who has not had a parent die young, or a substitute parent die young or someone who has not been sexually abused as a child, to make light of this, and I have absolutely no intention of doing that. I have been reading presentence reports for 20 years now and I'm absolutely convinced that people who are sexually abused as children are far more likely to offend as adults.

There may have been minimal testimony that was presented which supported a finding of this, but the Court is convinced that the defense has established, by a preponderance of the evidence, that the defendant lost a parent figure and was subjected to sexual abuse at a relatively young age. The Court is not convinced that there is any connection between that abuse, that loss, and his subsequent criminal behavior.

So, the Court does find that the defenses [sic] established, by a preponderance of the evidence, that the defendant was subject to family tragedy and family loss, but they have not established by a preponderance of the evidence that that would be a mitigating factor in this case.

(*Id.* at 54-55, 63, 66-67.)

The court also assessed the evidence concerning Petitioner's history of substance abuse and his use of drugs and alcohol at the time of the crimes:

The argument is made that the defendant was subjected to alcohol abuse and drug abuse. Other than very vague allegations that he has used alcohol in the past or has used drugs in the past, other than a fairly vague assertion that he was subject to some sort of effect of drugs and/or alcohol at the time that these offenses were committed, I really find very little to support the allegation that the defendant has a significant alcohol and/or drug abuse [sic], and again, going back to the methodical steps that were taken to murder three people to get a vehicle to get out of Golden Valley, it's very difficult for me to conclude that the defendant's ability to engage in goal-oriented behavior was, in any way, impaired at the time of the commission of these offenses.

> The Court finds that the defense has failed to establish, by a preponderance of the evidence, the nonstatutory mitigating factors of the defendant's alcohol abuse and/or drug abuse.

(*Id.* at 68-69.)

The court also considered Petitioner's remorse as a potential mitigator, concluding that Petitioner had established that he was remorseful about the murders but that it was not a nonstatutory mitigating factor because he had time "to reflect upon what he was doing, since killing three people did take some period of time, and considering the fact that his remorse could have kicked in at some point and maybe prevented one or two of these murders from taking place – keeping in mind the fact that even though he may have discussed turning himself in; he, in fact, did not turn himself in." (*Id.* at 53.)

Although noting that Petitioner had eventually cooperated with law enforcement and was well behaved during the trial, the court rejected as a mitigating circumstance Petitioner's potential to be rehabilitated. (*Id.* at 57.) The court also found that Petitioner failed to show family support as a mitigating factor. (*Id.* at 67-68.)

### 2. *Arizona Supreme Court*

On direct appeal, the Arizona Supreme Court first reviewed the statutory mitigating factors, agreeing with the trial court that Petitioner had failed to prove that drugs "significantly impaired his ability to appreciate the wrongfulness of his actions or to conform his conduct to the requirements of the law" under A.R.S. § 13-703(G)(1). *Poyson*, 198 Ariz. at 79-80, 7 P.3d at 88-89. The court explained:

> We cannot say that the defendant's drug use rendered him unable to conform his conduct to the requirements of the law. First of all, there is scant evidence that he was actually intoxicated on the day of the murders. Although Poyson purportedly used both marijuana and PCP "on as an available basis" in days preceding these crimes, the only substance he apparently used on the date in question was marijuana. However, the defendant reported smoking the marijuana at least six hours before killing Delahunt and eleven hours before the murders of Kagen and Wear. Thus, even if he was still "high" at the time of these crimes, it is unlikely that he was so intoxicated as to be unable to conform his conduct to the requirements of the law. In order to constitute (G)(1) mitigation, the defendant must prove substantial impairment from drugs or alcohol, not merely that he was "'buzzed.'" *State v. Schackart,* 190 Ariz. 238, 251, 947 P.2d 315, 328 (1997).

Defendant also claims to have had a PCP "flashback" during the murder of Delahunt. The trial court did not find the evidence credible on this point. We agree. Other than the defendant's self-reporting, nothing in the record supports this claim, nor is there evidence that any such "flashback" had an effect on his ability to control himself. Even taking the evidence at face value, the episode appears to have lasted only a few moments during Delahunt's murder. The defendant was apparently not under the influence of PCP at any other time. Thus, the flashback could not have affected his decision to begin the attack or to continue it once the flashback subsided; nor could it have played a role in his decision to kill Kagen and Wear later that night. We are therefore not convinced that Poyson's ability to control his conduct was significantly affected by PCP use.

Other evidence in the record belies the defendant's claim of impairment. For instance, he was able to concoct a ruse to obtain bullets from the neighbor. He also had the foresight to test the rifle, making sure it would work properly when needed, and to cut the telephone line to prevent Kagen and Wear from calling for help. These actions, coupled with the deliberateness with which the murders were carried out, lead us to conclude that the defendant was not suffering from any substantial impairment on the day in question. *See State v. Tittle,* 147 Ariz. 339, 343-44, 710 P.2d 449, 453-54 (1985) (detailed plan to commit murder was inconsistent with claim of impairment).

Poyson's attempts to conceal his crimes also indicate that he was able to appreciate the wrongfulness of his actions. For example, he had Kimberly Lane sneak him into the main trailer after murdering Delahunt so that he could wash the blood from his hands. He also covered Wear's body with debris in order to delay its discovery by police after he and the others had fled. These actions show that he "understood the wrongfulness of his acts and attempted to avoid prosecution." *State v. Jones,* 185 Ariz. 471, 489, 917 P.2d 200, 218 (1996) ((G)(1) not satisfied where defendant took significant steps to conceal his crimes and evade capture); *see also State v. Sharp,* 193 Ariz. 414, 424, 973 P.2d 1171, 1181, *cert. denied,* 528 U.S. 936, 120 S.Ct. 341, 145 L.Ed.2d 266 (1999) ((G)(1) not proven where defendant attempted to hide evidence that might link him to the crime). We also note that the defendant was able to recall in remarkable detail how he committed these murders. We have found this to be a significant fact in rejecting a perpetrator's claim that he could not appreciate the wrongfulness of his actions. *See, e.g., State v. Gallegos,* 185 Ariz. 340, 345, 916 P.2d 1056, 1061 (1996); *Rossi,* 154 Ariz. at 251, 741 P.2d at 1229; *State v. Wallace,* 151 Ariz. 362, 369, 728 P.2d 232, 239 (1986). We hold, therefore, that the defendant failed to prove the (G)(1) mitigating circumstance.

*Id.*

The court next considered Petitioner's youth as a statutory mitigating factor, disagreeing with the trial court that Petitioner's age of 19 did not satisfy A.R.S. § 13-703(G)(5) but finding that the factor was entitled to little weight:

- 13 -

Although Poyson was only nineteen at the time of the murders, the trial court ruled that his age was not a statutory mitigating factor under A.R.S. § 13-703(G)(5). The judge acknowledged that he was "relatively young, chronologically speaking," but said that he was not so young, "[a]s far as the criminal justice system goes." The court cited the fact that the defendant had lived on his own for some time before the crimes and had been working. Defendant argues that because of his age and immaturity, he was easily influenced by others, including his co-defendants in this case.

"The age of the defendant at the time of the murder can be a substantial and relevant mitigating circumstance." *State v. Laird,* 186 Ariz. 203, 209, 920 P.2d 769, 775 (1996). We have found the (G)(5) factor to exist in cases where defendants were as old as nineteen and twenty. Chronological age, however, is not the end of the inquiry. To determine how much weight to assign the defendant's age, we must also consider his level of intelligence, maturity, past experience, and level of participation in the killings. If a defendant has a substantial criminal history or was a major participant in the commission of the murder, the weight his or her age will be given may be discounted.

At his sentencing hearing, Poyson presented evidence that he was of "low average" intelligence. We agree with the trial court that this fact was shown by a preponderance of the evidence. Defendant also presented some evidence that he was immature and easily led by others. One of his cousins, for example, believed that because he lacked a consistent father figure growing up, he was prone to be influenced by older men like Frank Anderson. Arguably, these facts weigh in favor of assigning some mitigating weight to the defendant's age. However, he was no stranger to the criminal justice system. As a juvenile, he had committed several serious offenses, including burglary and assault, for which he served time in a detention facility. Moreover, it is clear that he was a major participant in these murders at both the planning and execution stages.

We conclude that Poyson's age is a mitigating circumstance. However, in light of his criminal history and his extensive participation in these crimes, we accord this factor little weight. *See Jackson,* 186 Ariz. at 31-32, 918 P.2d at 1049-50 (discounting defendant's age based on his high level of participation in the murder); *Gallegos,* 185 Ariz. at 346, 916 P.2d at 1062 (same); *Bolton,* 182 Ariz. at 314, 896 P.2d at 854 (same).

*Id.* at 80-81, 7 P.3d at 89-90 (citations omitted).

Finally, the Arizona Supreme Court independently reviewed and reweighed the aggravating and mitigating circumstances to determine the propriety of the death sentence. *Poyson*, 198 Ariz. at 81-82, 7 P.3d at 90-91. Like the trial court, the state supreme court engaged in an extensive evaluation of the proffered nonstatutory mitigating circumstances. The court considered the evidence as follows:

**Drug Use**
The trial judge refused to accord any weight to the defendant's

- 14 -

substance abuse as a nonstatutory mitigating circumstance. It characterized the defendant's claims that he had used drugs or alcohol in the past or was under the influence of drugs on the day of the murders as little more than "vague allegations." As discussed above, we agree.

### Mental Health

The trial court found that Poyson suffers from "certain personality disorders" but did not assign any weight to this factor. Dr. Celia Drake diagnosed the defendant with antisocial personality disorder, which she attributed to the "chaotic environment in which he was raised." She found that there was, among other things, no "appropriate model for moral reasoning within the family setting" to which the defendant could look for guidance. However, we find no indication in the record that "the disorder controlled [his] conduct or impaired his mental capacity to such a degree that leniency is required." *State v. Brewer,* 170 Ariz. 486, 505, 826 P.2d 783, 802 (1992); *see also Medina,* 193 Ariz. at 517, 975 P.2d at 107 (holding that the defendant's personality disorder "ha[d] little or no mitigating value" where the defendant's desire to emulate his friends, not his mental disorder, was the cause of his criminal behavior). We therefore accord this factor no mitigating weight.

### Abusive Childhood

The trial court found that the defendant failed to prove a dysfunctional family background or that he suffered physical or sexual abuse as a child. Defendant presented some evidence that as a youngster he was physically and mentally abused by several stepfathers and his maternal grandmother. He also self-reported one instance of sexual assault by a neighbor. Again, however, defendant did not show that his traumatic childhood somehow rendered him unable to control his conduct. Thus, the evidence is without mitigating value.

### Remorse

The trial court found that the defendant was remorseful about the commission of the offenses but gave that circumstance no weight. The court thought that if he were truly remorseful, he would have prevented one or two of the killings or would have turned himself in. Defendant presented some evidence of remorse. Sgt. Stegall testified that during questioning Poyson expressed remorse, particularly about the murder of Delahunt. In his statement to Detective Cooper, the defendant said that he felt "bad" about all of the murders. We find this evidence unpersuasive and, like the trial judge, accord it no real significance.

### Potential for Rehabilitation

The trial court ruled that the defendant failed to prove that he could be rehabilitated. The judge said that "[i]f there is anything that has been presented to even suggest that, I must have missed it." Dr. Drake's report suggests that the defendant is rehabilitatable, based on his past history of success in other institutional settings. She said that "[t]here are some indications that he . . . was responsive to the structure provided in various placements. In discharge summaries from all three institutions in which he was placed there was documented progress." We find that this evidence has some mitigating value. *See State v. Murray,* 184 Ariz. 9, 40, 906 P.2d 542, 573 (1995) (potential for rehabilitation can be a mitigating circumstance).

**Family Support**

The trial court found that the defendant failed to establish any meaningful family support. At the mitigation hearing, the defendant's mother and aunt testified. Other relatives cooperated with Mr. Abbott, the defense mitigation specialist, during his investigation, and several family members wrote letters asking the court to spare Poyson's life. We accord this factor minimal mitigating weight. *See State v. Gonzales,* 181 Ariz. 502, 515, 892 P.2d 838, 851 (1995) (family support can be given de minimis weight in mitigation).

After our independent review, we conclude that even crediting defendant's cooperation with law enforcement, age, potential for rehabilitation, and family support, the mitigating evidence in this case is not sufficiently substantial to call for leniency.

*Id.*

<u>Analysis</u>

Once a determination is made that a person is eligible for the death penalty, the sentencer must then consider relevant mitigating evidence, allowing for "an individualized determination on the basis of the character of the individual and the circumstances of the crime." *Tuilaepa v. California*, 512 U.S. 967, 972 (1994). The Supreme Court has explained that "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background [or to emotional and mental problems] may be less culpable than defendants who have no such excuse." *Wiggins v. Smith*, 539 U.S. 510, 535 (2003) (quoting *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989)). Therefore, the sentencer in a capital case is required to consider any mitigating information offered by a defendant, including non-statutory mitigation. *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (right to individualized sentencing in capital cases violated by Ohio statute that permitted consideration of only three mitigating factors); *Eddings v. Oklahoma*, 455 U.S. 104, 113-15 (1982) (*Lockett* violated where state courts refused as a matter of law to consider mitigating evidence that did not excuse the crime). In *Lockett* and *Eddings*, the Court held that under the Eighth and Fourteenth Amendments the sentencer must be allowed to consider, and may not refuse to consider, "any aspect of a defendant's character or record and any of the

circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604.

However, while the sentencer must not be foreclosed from considering relevant mitigation, "it is free to assess how much weight to assign such evidence." *Ortiz v. Stewart*, 149 F.3d 923, 943 (9th Cir. 1998); *see also State v. Newell*, 212 Ariz. 389, 405, 132 P.3d 833, 849 (2006) (mitigating evidence must be considered regardless of whether there is a "nexus" between the mitigating factor and the crime, but the lack of a causal connection may be considered in assessing the weight of the evidence). As the *Eddings* court explained: "The sentencer . . . may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration." 455 U.S. at 114-15.

In its analysis of Claims 2 and 3, the Court takes several principles into account. First, the Supreme Court has held that if a death penalty scheme provides a rational criterion for eligibility and no limitation on the consideration of relevant circumstances that could mitigate against a death sentence, then "the States enjoy their traditional latitude to prescribe the method by which those who commit murder shall be punished." *Romano v. Oklahoma*, 512 U.S. 1, 7 (2004) (quoting *Blystone v. Pennsylvania*, 494 U.S. 299, 309 (1990)). The Court has emphasized that there is no required formula for weighing mitigating evidence, and the sentencer may be given "unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty." *Zant v. Stephens*, 462 U.S. 862, 875 (1983); *see Kansas v. Marsh*, 548 U.S. 163, 175 (2006) ("our precedents confer upon defendants the right to present sentencers with information relevant to the sentencing decision and oblige sentencers to consider that information in determining the appropriate sentence. The thrust of our mitigation jurisprudence ends here."); *Harris v. Alabama*, 513 U.S. 504, 512 (1995) (Constitution does not require that a specific weight be given to any particular mitigating factor); *Tuilaepa*, 512 U.S. at 979-80.

Conversely, while the sentencer in a capital case may be afforded unbridled discretion in considering the appropriate sentence, "there is no . . . constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence 'in an effort to achieve a more rational and equitable administration of the death penalty.'" *Boyde v. California*, 494 U.S. 370, 377 (1990) (quoting *Franklin v. Lynaugh*, 487 U.S. 164, 181 (1988) (plurality opinion)); *see Johnson v. Texas*, 509 U.S. 350, 362 (1993). The Supreme Court has explained that "*Lockett* and its progeny stand only for the proposition that a State may not cut off in an absolute manner the presentation of mitigating evidence, either by statute or judicial instruction, or by limiting the inquiries to which it is relevant so severely that the evidence could never be part of the sentencing decision at all." *Johnson*, 509 U.S. at 361-62 (quoting *McKoy v. North Carolina*, 494 U.S. 433, 456 (1990) (Kennedy, J., concurring in judgment)). Thus, "[a]lthough *Lockett* and *Eddings* prevent a State from placing relevant mitigating evidence 'beyond the effective reach of the sentencer,' *Graham v. Collins*, [506 U.S. 461, 475 (1993)], those cases and others in that decisional line do not bar a State from guiding the sentencer's consideration of mitigating evidence." *Johnson*, 509 U.S. at 362.

Finally, on habeas review, a federal court does not evaluate the substance of each piece of evidence submitted as mitigation. Instead, it reviews the record to ensure the state court allowed and considered all relevant mitigating information. *See Jeffers v. Lewis*, 38 F.3d 411, 418 (9th Cir. 1994) (en banc) (when it is evident that all mitigating evidence was considered, the trial court is not required to discuss each piece of evidence); *see also Lopez v. Schriro*, 491 F.3d 1029, 1037 (9th Cir. 2007), *cert. denied*, 128 S. Ct. 1227 (2008) (rejecting claim that the sentencing court failed to consider proffered mitigation where the court did not prevent the defendant from presenting any evidence in mitigation, did not affirmatively indicate there was any evidence it would not consider, and expressly stated it had considered all mitigation evidence proffered by the defendant). As the Ninth Circuit explained in *LaGrand v. Stewart*, 133 F.3d 1253, 1263 (9th Cir. 1998), rejecting the

petitioner's argument that the state courts failed to consider the mitigation evidence "fully":

> federal courts do not review the imposition of the sentence *de novo*. Here, as in the state courts' finding of the existence of an aggravating factor, we must use the rational fact-finder test of *Lewis v. Jeffers*. That is, considering the aggravating and mitigating circumstances, could a rational fact-finder have imposed the death penalty?

The court reiterated that such a determination takes into account the strength of the aggravating factors, which, in the LaGrand case, included pecuniary gain and a murder committed in an especially cruel, heinous, or depraved manner. *Id.*

Applying these principles, it is apparent in Petitioner's case that the trial court and the Arizona Supreme Court fulfilled their constitutional obligation by allowing and considering all of the mitigating evidence.

In Claim 2, Petitioner relies on *Tennard v. Dretke*, 542 U.S. 274, 289 (2004), for the proposition that the death penalty was unconstitutionally imposed in his case because Arizona law required capital defendants to show a causal connection or nexus between the proffered mitigation evidence and the crimes. (Dkt. 27 at 39-44.) In Claim 3, Petitioner alleges that the trial court did not give adequate weight to several mitigating circumstances proffered at sentencing, including his impaired capacity, remorse, and alcohol and drug use. (Dkt. 27 at 44-48.) The following analysis, while focusing on the causal connection issue, necessarily addresses the arguments raised in both claims.

With respect to Claim 2, the Court disagrees that the holding in *Tennard* entitles Petitioner to habeas relief. In *Tennard*, the Supreme Court revisited Texas's capital sentencing procedure, which it had addressed in several previous cases, including *Penry v. Lynaugh*, 492 U.S. 302 (1989) (*Penry I*), and *Penry v. Johnson*, 532 U.S. 782 (2001) (*Penry II*). The sentencing procedure at issue required the jury to answer three special questions: first, whether the conduct of the defendant was deliberate and committed with the reasonable expectation that death would result; second, whether there is a reasonable probability that the defendant would commit further acts of violence that would constitute a continuing threat to society; and third, if raised by the evidence, whether the defendant's conduct was

unreasonable in response to any provocation by the deceased. *Penry I*, 492 U.S. at 310. If the jury answered each question affirmatively, the court must sentence the defendant to death. *Id.*

In *Penry I*, the Supreme Court held that this special issues scheme violated the Eighth Amendment by failing to allow jurors to give full effect to evidence of the defendant's mental retardation and childhood abuse. *Id.* at 319-28. The Court explained that in the context of the special issues, Penry's mental retardation had relevance beyond the issue of the deliberateness of the crime and, with respect to future dangerousness, would be viewed as aggravating rather than mitigating evidence, in that it suggested Penry would be unable to learn from his mistakes. *Id.* at 322-23. In *Penry II*, the Court held that the defects in Texas's sentencing scheme were not cured by a supplemental instruction directing the jury to consider and weigh mitigating circumstances and stating that jurors could answer no to a special issue if they believed that a life sentence was appropriate. 532 U.S. at 789-90. The Court found that the instruction failed to address the fact that "none of the special issues is broad enough to provide a vehicle for the jury to give mitigating effect to the evidence of Penry's mental retardation and childhood abuse." *Id.* at 798. Also, because such evidence did not fit within the scope of the special issues, "answering those issues in the manner prescribed on the verdict form necessarily meant ignoring the command of the supplemental instruction." *Id.* at 799-800.[6]

In *Tennard*, the Court held that the habeas petitioner was entitled to a certificate of appealability on his claim that Texas's capital sentencing scheme failed to provide a constitutionally adequate opportunity to present his low IQ as a mitigating factor. 542 U.S. 289. Tennard was sentenced to death after the jury provided affirmative answers to the

---

[6]     In *Brewer v. Quarterman*, 550 U.S. 286 (2007), and *Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007), the Supreme Court again found that the Texas special issues framework, without an additional instruction on mitigating evidence, did not allow juries to give effect to evidence of mental illness, an abusive childhood, and substance abuse.

deliberateness and future dangerousness special issues. The district court denied Tennard's federal habeas petition in which he claimed that his death sentence violated the Eighth Amendment as interpreted in *Penry*, and denied a certificate of appealability (COA). The Fifth Circuit agreed that Tennard was not entitled to a COA. *Tennard v. Cockrell*, 284 F.3d 591 (5th Cir. 2002). This decision was based on the circuit court's application of a threshold test for the constitutional relevance of mitigating evidence, according to which relevant mitigating evidence is evidence of a "uniquely severe permanent handicap" that bore a "nexus" to the crime. *Id.* at 595. The court concluded that low IQ evidence alone does not constitute a uniquely severe condition and that no evidence tied Tennard's IQ to retardation. *Id.* at 596. The court also determined that even if Tennard's low IQ amounted to mental retardation evidence, he failed to show that his crime was attributable to his mental capacity. *Id.* at 597-97.

The Supreme Court reversed, holding that Tennard was entitled to a COA with respect to the district court's denial of his *Penry* claim. *Tennard*, 542 U.S. at 289. In doing so, the Court rejected the Fifth Circuit's "screening test," explaining that "impaired intellectual functioning is inherently mitigating," *id.* at 287 (quoting *Atkins v. Virginia*, 536 U.S. 304, 316 (2002)), and that the relevance of "low IQ evidence" does not depend on a "nexus" between the evidence and the crime, *id.* The Court stated that "we cannot countenance the suggestion that low IQ evidence is not relevant mitigating evidence – and thus that the *Penry* question need not even be asked – unless the defendant also establishes a nexus to the crime." *Id.* In *Smith v. Texas*, 543 U.S. 37, 44-45 (2004) (per curiam), the Court again rejected the causal nexus screening test, this time as it was applied by the state appellate court in finding evidence of Smith's low IQ and troubled childhood irrelevant for mitigation purposes.

In *Tennard* the Supreme Court condemned the circuit's ruling because it barred review of whether the Texas special issues framework could give full effect to relevant mitigating evidence proffered by Tennard. The holding in *Tennard* does not entitle Petitioner to relief because Arizona law did not impose any such barrier to consideration of Petitioner's

- 21 -

mitigating evidence.

As an initial matter, Arizona's death penalty statute, unlike the special issues framework in Texas, explicitly provides for the type of review mandated by *Lockett* and *Eddings*:

> Mitigating circumstances shall be any factors proffered by the defendant or the state which are relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities or record and any of the circumstances of the offense, including but not limited to the following [enumerated statutory mitigating factors].

A.R.S. § 13-703(G)(1) (West 1996) (transferred and renumbered as A.R.S. § 13-751 in 2009).[7] Arizona's sentencing statute thus establishes a framework for the consideration of mitigating evidence far less restrictive than that provided by the special issues system that was the subject of *Tennard*, *Penry*, and *Johnson*.

Because the statute mandates the consideration of any relevant mitigating evidence, the only question is whether the Arizona courts' application of a causal connection to certain types of mitigating evidence violates *Lockett* and *Eddings*.[8] The Court concludes that it does not. Instead, Arizona's causal nexus test is a permissible means of guiding a sentencer's

---

[7] Prior to *Lockett*, Arizona's death penalty statute, A.R.S. § 13-454, enumerated certain mitigating factors but did not contain a catch-all provision. In *State v. Watson*, 120 Ariz. 441, 586 P.2d 1253 (1978), the Arizona Supreme Court held that § 13-454, with its restriction on the consideration of mitigating factors outside those specified in the statute, did not satisfy *Lockett*. Shortly after *Watson*, the Arizona legislature amended the mitigation portion of the death penalty statute to conform with *Lockett* by requiring the sentencer in a capital case to consider any relevant mitigating information. A.R.S. § 13-703(G).

[8] Contrary to Petitioner's argument (Dkt. 27 at 43), Arizona's causal nexus test does not prevent the consideration of mitigating evidence, such as evidence of a defendant's good character, that is unrelated to the crime. *See, e.g.*, *State v. Greene*, 192 Ariz. 431, 443, 967 P.2d 106, 118 (1998) ("past good conduct and character is a relevant mitigating circumstance"). In addition, where a causal connection has been shown between mitigating evidence of mental illness, a low IQ, or a dysfunctional family background, Arizona courts give the evidence "substantial weight." *State v. Roque*, 213 Ariz. 193, 231, 141 P.3d 368, 406 (2006); *see State v. Trostle*, 191 Ariz. 4, 21, 951 P.2d 869, 886 (1997); *State v. Stuard*, 176 Ariz. 589, 609, 863 P.2d 881, 901 (1993).

- 22 -

discretion in considering and weighing mitigating evidence.

The Court finds support for this conclusion in cases such as *Johnson v. Texas* and *Saffle v. Parks*, 494 U.S. 484 (1990), which stand for the proposition that states may "structure and shape consideration of mitigating evidence." *Johnson*, 509 U.S. at 362 (interior quotations omitted). In *Johnson*, the petitioner argued that the Texas special issues framework prevented the jury from giving effect to his youth as a mitigating circumstance. 509 U.S. at 366. The Court disagreed, holding that the jury, which had been instructed to consider all mitigating evidence, could give effect to evidence of Johnson's age in the context of the future dangerousness special issue. *Id.* at 367-70. The Court further explained that "accepting petitioner's arguments would entail an alteration of the rule of *Lockett* and *Eddings.* Instead of requiring that a jury be able to consider in some manner all of a defendant's relevant mitigating evidence, the rule would require that a jury be able to give effect to mitigating evidence in every conceivable manner in which the evidence might be relevant." *Id.* at 372.

In *Saffle v. Parks*, the Supreme Court held that an instruction directing the jury to avoid any influence of sympathy when imposing sentence did not violate *Lockett* and *Eddings* by barring relevant mitigating evidence from being presented and considered during the penalty phase of a capital proceeding. The Court rejected Parks's argument that "jurors who react sympathetically to mitigating evidence may interpret the instruction as barring them from considering that evidence altogether," stating that the "argument misapprehends the distinction between allowing the jury to consider mitigating evidence and guiding their consideration. It is no doubt constitutionally permissible, if not constitutionally required, for the State to insist that 'the individualized assessment of the appropriateness of the death penalty [be] a moral inquiry into the culpability of the defendant, and not an emotional response to the mitigating evidence.'" *Id.* at 492-93 (citation omitted) (quoting *California v. Brown*, 479 U.S. 538, 545 (1987)). The Court explained: "The State must not cut off full and fair consideration of mitigating evidence; but it need not grant the jury the choice to

make the sentencing decision according to its own whims or caprice." *Id.* at 493. The Court further observed that "there is no contention that the State altogether prevented Parks' jury from considering, weighing, and giving effect to all of the mitigating evidence that Parks put before them; rather, Parks's contention is that the State has unconstitutionally limited the manner in which his mitigating evidence may be considered. As we have concluded above, the former contention would come under the rule of *Lockett* and *Eddings*; the latter does not." *Id.* at 491; *see Eddings*, 455 at 113 (distinguishing between "evaluat[ing] the evidence in mitigation and finding it wanting as a matter of fact" and refusing as a "matter of law . . . even to consider the evidence"); *Williams v. Stewart*, 441 F.3d 1030, 1057 (9th Cir. 2006) ("We have recognized a distinction between a failure to consider relevant mitigating evidence and a conclusion that such evidence was not mitigating.").

Petitioner's contention is that the Arizona courts, by way of the causal nexus test applied to certain types of mitigating evidence, impermissibly limited the manner in which his mitigating evidence was considered. However, because the state courts did not altogether prevent the sentencer from considering and weighing Petitioner's mitigating evidence, *Lockett* and *Eddings* were not violated.

The state courts did not give the proffered mitigating evidence "no weight *by excluding such evidence from their consideration*." *Eddings*, 455 U.S. at 114-15 (emphasis added). Petitioner's "mitigating evidence was not placed beyond the [sentencer's] effective reach," nor was the "sentencer . . . precluded from even considering certain types of mitigating evidence." *Johnson*, 509 U.S. at 366. The state courts did not violate *Lockett* and *Eddings* by excluding any of Petitioner's proffered mitigating evidence. *See Skipper v. South Carolina*, 476 U.S. 1, 8-9 (1986) (*Lockett* and *Eddings* violated when trial court excluded as irrelevant testimony from jailer regarding defendant's positive adjustment to incarceration); *Davis v. Coyle*, 475 F.3d 761, 771-73 (6th Cir. 2007) (*Lockett* and *Eddings* violated when resentencing court disallowed relevant evidence of good behavior in prison); *Jones v. Polk*, 401 F.3d 257, 262-64 (4th Cir. 2005) (violation where court excluded testimony that

defendant had expressed remorse).  To the contrary, as illustrated above, the sentencing court and the Arizona Supreme Court were afforded "full access" to the proffered mitigation information, *Marsh*, 548 U.S. at 174, which they carefully analyzed and weighed.

The trial court and the state supreme court thoroughly discussed the mitigating circumstances advanced by Petitioner at sentencing, including his family background, mental health, and substance abuse.  The fact that the courts accorded these factors little or no weight does not amount to a constitutional violation under *Lockett* and *Eddings*.  *Ortiz v. Stewart*, 149 F.3d 923, 943 (9th Cir. 1998); *Ceja v. Stewart*, 97 F.3d 1246, 1251 (9th Cir. 1996); *Atkins v. Singletary*, 965 F.2d 952, 962 (11th Cir. 1992) ("Although Atkins argues that the trial judge did not *consider* nonstatutory factors, it is more correct to say that the trial judge did not *accept* – that is, give much weight to – Atkins' nonstatutory factors. Acceptance of nonstatutory mitigating factors is not constitutionally required; the Constitution only requires that the sentencer *consider* the factors."); *State v. Mata*, 185 Ariz. 319, 331 n.6, 916 P.2d 1035, 1047 (1996) ("Defendant seems to believe that a trial court only 'considers' mitigating evidence if it imposes a mitigated sentence.  The law is to the contrary.  So long as the trial court considers the evidence, the judge is not bound to conclude that the evidence calls for leniency.").  The Court is simply unaware of any support for the proposition that mitigating evidence, once admitted and under consideration, is entitled to any specific weight.  *See, e.g.*, *Allen v. Buss*, 558 F.3d 657, 667 (7th Cir. 2009) ("The rule of *Eddings* is that a sentencing court may not exclude relevant mitigating evidence.  But of course, a court may choose to give mitigating evidence little or no weight.") (internal citations omitted); *United States v. Johnson*, 495 F.3d 951, 966 (8th Cir. 2007) (jurors in capital sentencing are "obliged to consider relevant mitigating evidence, but are permitted to accord that evidence whatever weight they choose, including no weight at all"); *Schwab v. Crosby*, 451 F.3d 1308, 1329-30 (11th Cir. 2006) ("The Constitution requires that the sentencer be allowed to consider and give effect to evidence offered in mitigation, but it does not dictate the effect that must be given once the evidence is considered; it does not require

the sentencer to conclude that a particular fact is mitigating or to give it any particular weight.").

The Court is likewise unaware of any precedent holding that it is inappropriate for a sentencer, when weighing mitigating evidence concerning a defendant's background, substance abuse, or mental health, to consider the extent to which the evidence offers an explanation of the criminal conduct. *See Allen v. Woodford*, 395 F.3d 979, 1005-10 (9th Cir. 2005) (noting that mitigating evidence may serve both a "humanizing" and an "explanatory" or "exculpatory" purpose, with greater weight generally being ascribed to the latter category).

The Ninth Circuit has addressed the *Tennard* issue in two recent cases: *Styers v. Schriro*, 547 F.3d 1026 (9th Cir. 2009) (per curiam), *cert. denied*, 130 S. Ct. 379 (2009); and *Schad v. Ryan*, --- F.3d ----, No. 07-99005, 2010 WL 92758 (9th Cir. Jan. 12, 2010). In *Styers*, the Arizona Supreme Court struck one of the aggravating factors found by the sentencing court, then reweighed the remaining aggravating factors against the mitigating circumstances. *State v. Styers*, 177 Ariz. 104, 117, 865 P.2d 765, 777 (1993). In affirming the death sentence, the court stated that evidence Styers suffered from post-traumatic stress disorder did not "constitute mitigation" because Styers could not connect his condition to his behavior at the time of the crimes. *Id.* The Ninth Circuit held that the Arizona Supreme Court "appears" to have imposed an improper nexus test, which resulted in a failure to consider the mitigating evidence in violation of *Smith* and *Eddings*. *Styers*, 547 F.3d at 1035-36. In *Schad*, by contrast, the Ninth Circuit found no such violation because the state courts did not "refuse[] to consider any evidence Schad offered"; the courts did not "exclude[] mitigation evidence" and "the record shows that the sentencing court did consider and weigh the value" of the mitigating evidence. *Schad*, --- F.3d ----, 2010 WL 92758, at *17. The Court of Appeals noted that the trial court weighed evidence concerning Schad's childhood but found it was not "a persuasive mitigating circumstance" and the Arizona Supreme Court "conducted an independent review of the entire record regarding the aggravating and mitigating factors." *Id.* In Petitioner's case, like *Schad*, the record shows that the trial court

did not exclude or refuse to consider any mitigating evidence, and the Arizona Supreme Court independently reweighed the aggravating and mitigating circumstances. *Poyson*, 198 Ariz. at 81-82, 7 P.3d at 90-91. In carrying out its independent review, the supreme court considered and evaluated all the proffered mitigating circumstances, including Petitioner's mental health issues and troubled childhood, but determined that in the absence of a causal relationship to the murders they had little or no mitigating "weight" or "value." The court did not state that the lack of a causal connection foreclosed consideration of the evidence or that such evidence could not "constitute" mitigation.

While *Tennard* and *Smith* invalidated the use of a causal connection test as a screening mechanism that excluded consideration of relevant mitigating evidence, they did not address the legitimacy of such a test as a means of guiding the sentencer's discretion or assessing the weight of mitigating evidence. This Court concludes that Arizona's causal nexus test provides a rational standard by which to "structure and shape consideration of mitigating evidence." *Johnson*, 509 U.S. at 362. It is difficult to conceive that a violation of *Lockett* and *Eddings* occurs when a sentencing judge in Arizona, having admitted and considered all proffered mitigating evidence as required by statute, takes into account the relationship between the evidence and the crime when determining the appropriate sentence.[9]

---

[9] In cases such as Petitioner's, decided prior to *Ring v. Arizona*, 536 U.S. 584 (2002), the trial judge, rather than the jury, made the findings that a defendant was eligible for the death penalty and that death was the appropriate sentence. By rendering written findings detailing their consideration of aggravating and mitigating circumstances, Arizona judges made explicit their thought processes, including the manner in which they weighed information about a defendant's mental health, substance abuse, or family background. Of course, there is no such record of the deliberations of a sentencing jury. There is every likelihood that a capital sentencing jury, presented with, for example, evidence of a defendant's mental illness, would consider the effect, if any, of such a condition on the defendant's criminal conduct. This would not result in an Eighth Amendment violation, because once a proper eligibility determination is made, a jury's sentencing discretion may be "unbridled." *Zant v. Stephens*, 462 U.S. at 875. An Arizona sentencing judge undertakes the same weighing process, with the single difference that his or her deliberations are recorded. While this phenomenon has exposed judges' sentencing decisions to a unique level

<u>Conclusion</u>

Arizona law requires the sentencer in a capital case to consider all relevant mitigating evidence. In Petitioner's case, the trial court at sentencing and the Arizona Supreme Court on direct review considered and weighed all of Petitioner's proffered mitigating evidence. The fact that the weighing process was guided in part by the application of a causal nexus test did not violate Petitioner's right to have all relevant mitigating evidence considered. Weighing the mitigating circumstances proffered by Petitioner against the three strong aggravating factors proven by the State, a rational factfinder could have sentenced Petitioner to death. Claims 2 and 3 are therefore denied.

**Claim 4**

Petitioner alleges that the trial court conducted an "inadequate voir dire" by failing to use a juror questionnaire and refusing to allow individualized questioning of prospective jurors. (Dkt. 27 at 48.) Respondents contend that the claim is unexhausted and procedurally barred because it was not presented to the state courts in a procedurally appropriate manner.

Petitioner did not raise this claim on direct appeal. (Dkt. 31, Ex. B.) In his PCR petition, Petitioner did not raise an independent claim of inadequate voir dire but alleged that appellate counsel performed ineffectively by failing to challenge the trial court's voir dire procedures. (*Id.*, Ex. J at 18-22.) Petitioner's petition for review included the appellate ineffective assistance claims only in an appendix. (Dkt. 32, Ex. O.) In reply to Respondents' challenge to the procedural status of the claim, Petitioner cites ineffective assistance of appellate counsel as cause for any default.

The Court considers Petitioner's claim of ineffective assistance of appellate counsel in Claim 7(A) below and finds it without merit because the underlying challenges to the trial court's voir dire procedures would not have entitled him to relief. For the reasons set forth

---

of scrutiny, particularly since the ruling in *Tennard*, there is nothing in the structure of Arizona's death penalty statute that limited the judges' consideration of mitigating evidence.

in its analysis of Claim 7(A), the Court will consider and deny Claim 4 on the merits regardless of its procedural status. *See* 28 U.S.C. § 2254(b)(2) (allowing denial of unexhausted claims on the merits); *Rhines*, 544 U.S. at 277.

**Claim 5**

Petitioner alleges that he received ineffective assistance of counsel during the guilt phase of his trial. (Dkt. 27 at 51.) He contends that trial counsel failed to (A) examine crucial physical evidence in a timely fashion, (B) retain experts to assist in developing appropriate defenses, and (E) move for a mistrial based on a venire member's prejudicial statement.

Claims of ineffective assistance of counsel are governed by the principles set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. *Id.* at 687-88.

The inquiry under *Strickland* is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. Thus, to satisfy *Strickland*'s first prong, a defendant must overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *Id.* at 687-88.

With respect to *Strickland*'s second prong, a petitioner must affirmatively prove prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Because an ineffective assistance of counsel claim must satisfy both prongs of *Strickland*, the reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.* at 697 ("if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed").

Under the AEDPA, this Court's review of the state court's decision is subject to another level of deference. *Bell v. Cone*, 535 U.S. 685, 698-99 (2002); *see Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009) (noting that a "doubly deferential" standard applies to *Strickland* claims under the AEDPA). Therefore, to prevail on this claim, Petitioner must make the additional showing that the state court, in ruling that counsel was not ineffective, applied *Strickland* in an objectively unreasonable manner. 28 U.S.C. § 2254(d)(1).

<u>Physical evidence</u>

Petitioner alleges that trial counsel performed ineffectively by failing, in a timely manner, to examine a bloody palm print, interview the State's fingerprint expert, and hire a defense expert to challenge the evidence. (Dkt. 27 at 54-56.)

On February 4, 1998, the trial court ordered the prosecution and defense to disclose, no later than two weeks before the trial date of March 2, 1998, the names and addresses of witnesses and any statements or reports prepared by such witnesses. (RT 2/4/98 at 26.) On February 25, defense counsel interviewed Glenda Hardy, a fingerprint examiner for the Arizona Department of Public Safety. (RT 3/2/98 at 7-8.) During the interview, Hardy referred to a "bloody palm print" that was found on a shelf in the trailer where Delahunt was killed and that she identified as belonging to the Petitioner. (*Id.* at 8.) Defense counsel asked the trial court to exclude the palm print because the State had violated the discovery deadline; alternatively, counsel sought a continuance so a defense expert could analyze the print. (*Id.* at 9.) Counsel asserted that Hardy's previous reports had referred only to "latent" prints and did not mention a "bloody palm print." (*Id.* at 7-8.) He also argued that the late disclosure

was prejudicial because the palm print was the only physical evidence linking Petitioner to the murders. (*Id.* at 8.) The court denied the defense motions, finding that while the State "didn't refer to [the palm print] with as much specificity as they could have," it had complied with the discovery requirements by disclosing the existence of "latent prints." (*Id.* at 18-19.) The court further noted that "the problem here is simply that the defense did not make the connection as to what this was." (*Id.* at 18.) At trial, Hardy testified that Petitioner's palm print was found in a "red liquid" on a shelf in the trailer. (RT 3/5/98 at 120.)

In his PCR petition, Petitioner alleged that counsel was ineffective for failing to examine this physical evidence. (Dkt. 31, Ex. J at 25-26.) The PCR court denied the claim, finding that Petitioner could not establish that he was prejudiced by counsel's performance. (Dkt. 32, Ex. N at 15.) In support of this determination, the PCR court cited the opinion of the Arizona Supreme Court, which, in addressing Petitioner's challenge to the admissibility of the palm print evidence, explained:

> Assuming, *arguendo,* that the trial court should not have admitted the palm print, we nevertheless conclude that the error was harmless. During his interview with Detective Cooper, Poyson gave a tape-recorded statement in which he admitted his involvement in these murders. The jury heard the tape at trial. Along with this voluntary confession, the State presented physical evidence from the scene and testimony by the medical examiner, all of which confirmed that the murders occurred exactly as the defendant said they had. Given the weight of this evidence, a jury would almost certainly have returned a guilty verdict even without the palm print. Any error in admitting it or in denying the motion for a continuance was harmless beyond a reasonable doubt.

*Poyson*, 198 Ariz. at 77-78, 7 P.3d at 86-87 (citations omitted). The PCR court also noted that Petitioner failed to show what evidence would have been developed if trial counsel had retained a fingerprint expert. (Dkt. 32, Ex. N at 16.)

The PCR court's denial of this claim was neither contrary to nor an unreasonable application of *Strickland*. Petitioner cannot show that he was prejudiced by counsel's performance. First, as both the PCR court and the Arizona Supreme Court recognized, the evidence of Petitioner's guilt, namely his confession and corroborating evidence from the autopsies, was substantial enough that there was no reasonable probability of a different

outcome if defense counsel had challenged the palm print evidence more thoroughly. In addition, as the PCR court explained, Petitioner cannot show prejudice because there is no suggestion that the evidence was susceptible to any such challenge. Petitioner does not assert that a defense expert would have testified that the print did not belong to him or that the State's methodology in collecting and analyzing the print was suspect. *See Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001) (speculation as to what expert might say "is insufficient to establish prejudice"); *Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997) (same); *Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002) ("complaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what the witness would have testified are largely speculative" and "to demonstrate the requisite *Strickland* prejudice, [petitioner] must show not only that [the] testimony would have been favorable, but also that the witness would have testified at trial.") (citations omitted).

Experts

Petitioner contends that trial counsel performed ineffectively by failing to retain experts to assist in developing appropriate defenses. Specifically, Petitioner asserts that counsel should have retained mental health experts to show that he suffers from neurological impairments caused by fetal alcohol syndrome and that such impairments rendered him incapable of premeditation. (Dkt. 27 at 57-58.) Petitioner also argues that counsel should have sought an expert in the field of coerced confessions. (*Id.* at 58.)

*Mental health experts*

Prior to trial, defense counsel moved for an examination under Rule 11 to assess Petitioner's competency to stand trial and his mental condition at the time of the offenses. (ROA docs. 17, 27.) The motion was granted, and two experts performed examinations.

(ME 7/25/97.) Counsel did not retain additional mental health experts for the guilt phase of trial.[10]

In his PCR petition, Petitioner alleged that trial counsel performed ineffectively by failing to "immediately secure the appointment of mental health experts." (Dkt. 31, Ex. J at 14.) According to Petitioner, this failure prevented him from presenting a "diminished capacity" defense under *State v. Christensen*, 129 Ariz. 32, 35-36, 628 P.2d 580, 583-84 (1981). (*Id.*) Petitioner further contended that the testimony of such an expert would have supported an instruction on second degree murder, which the trial court refused to give. (*Id.* at 15.)

During the PCR proceedings, Petitioner sought and was authorized funds to retain a neuropsychological expert, Dr. Robert Briggs. (PCR-ROA Vol. VIII, Mtn. for Funds for Expert Witness; M.E. 2/1/02.) He appended Dr. Briggs's report to his PCR petition in support of this claim. (Dkt. 32, Ex. U.) While the report detailed Petitioner's prenatal exposure to drugs and alcohol and a childhood head injury, Dr. Briggs's testing revealed no significant neuropsychological impairment or cognitive dysfunction. (*Id.* at 1, 6.) The testing also revealed, contrary to the evidence proffered at sentencing, that Petitioner's IQ was in the high average range. (*Id.* at 5-6.)

In considering this claim, the PCR court concluded that nothing in the Briggs report indicated that a pre-trial neuropsychological examination would have yielded results more favorable to the defense than those obtained by the two experts who examined Petitioner pursuant to Rule 11. Accordingly, the court found that Petitioner had failed to establish a colorable claim of ineffective assistance. (Dkt. 32, Ex. N at 4-6.) The court detailed its analysis as follows:

> [T]he Defendant's attorney did request a Rule 11 mental health evaluation just months after the arrest of the Defendant. The comments made by trial counsel

---

[10] Another examination was conducted in preparation for the sentencing phase. (Dkt. 32, Ex. T.)

in requesting and eventually getting such an examination made it clear that he understood the importance of such an examination. Pursuant to Rule 11 he actually obtained not just one but two mental health examinations of the Defendant relatively soon after the time in question. The appointed mental health experts were directed to address not only the Defendant's competency to stand trial but also his mental condition at the time of the alleged offense.

Rule 32 counsel asserts that an earlier evaluation of the Defendant's mental state might have provided a basis for a diminished capacity defense under State v. Christensen, 129 Ariz. 32 (1981). That assertion overlooks not only what the cited case stands for but also what was discovered through the Rule 11 process in this case. Christensen does not stand for the proposition that Arizona recognizes a diminished capacity defense. It simply holds that a defendant's tendency under stress to act more reflexively than reflectively may be relevant to determine whether he acted with premeditation and that expert testimony establishing such tendency should be admissible. Rule 32 counsel actually cites one of the Rule 11 mental health expert's finding of impulsivity on the part of the Defendant, affirming that the Rule 11 process did yield information about the Defendant's mental state to enable a claim to be made that he did not act with premeditation. Rule 32 counsel is not claiming that trial counsel was ineffective for failure to use the information gained through the Rule 11 process but that he was ineffective for failing to obtain such information in a timely manner. The record does not support this claim.

Rule 32 counsel has sought to strengthen this claim for relief by attaching to his Petition a written report by Dr. Robert Briggs, a clinical neuropsychologist. This apparently resulted from an examination of the Defendant performed in March, 2002, more than 5 years after the crimes with which he was charged, more than 4 years after the trial on those charges and more than 3 years after the sentencing. The Court assumes for purposes of addressing this issue that Dr. Briggs, if called to testify at an evidentiary hearing, would testify consistently with his report. . . .

The assertion by Rule 32 counsel that the results of Dr. Briggs' evaluation would have assisted trial counsel more than the reports done pursuant to Rule 11 is belied by reading that evaluation. One cannot help but note initially how often Dr. Briggs refers in his report to the investigation done by the court-appointed investigator and to the mental health reports done by the court-appointed experts. The value of these earlier investigations and evaluation was obviously as clear to trial counsel as it was to the mental health expert hired years after the fact. Contrary to the assertion of Rule 32 counsel, Dr. Briggs' report does not indicate that he found any evidence that the Defendant at the time of his examination or any time in the past was "brain damaged." The report does identify that the Defendant had previously suffered a head injury and that an improvement in neurological functions would occur with the passage of time, assisted by sobriety, after such an injury. Dr. Briggs does not, however, indicate that such process would not have occurred prior to the commission of the crimes in this case. Dr. Briggs found the Defendant's performance to be within the normal range of neuropsychological functioning. He found no pattern of cognitive dysfunction. He found that the Defendant's brain was intact and that he had good abilities when he accesses it. There is no indication that an examination done by Dr. Briggs 5 years earlier might have yielded results more favorable

to the defense at trial or sentencing than those obtained from the experts requested by trial counsel.

(*Id.* at 4-6.)

In his habeas petition, Petitioner alleges that "neurological impairments that resulted from [fetal alcohol syndrome] arguably prevented Petitioner from engaging in the reflection necessary to form the *mens rea* of premeditation." (Dkt. 27 at 58.)  He also contends that expert testimony concerning his neurological impairment would have supported an instruction on a lesser degree of murder.  (*Id.*)

The Court first notes, consistent with the PCR court's ruling, that according to Dr. Briggs's report there is no evidence that Petitioner suffers from neurological impairment. (Dkt. 32, Ex. U at 6.)  Therefore, Petitioner cannot support his conclusory allegation that counsel performed deficiently by failing to find an expert who would have testified to such impairment.

To the extent this claim relies on counsel's failure to secure an expert witness to opine that Petitioner was incapable of premeditation, its premise is faulty.  "Arizona does not allow evidence of a defendant's mental disorder short of insanity either as an affirmative defense or to negate the *mens rea* element of a crime."  *State v. Mott*, 187 Ariz. 536, 541, 931 P.2d 1046, 1051 (1997).  A defendant cannot present evidence of mental disease or defect to show that he was *incapable* of forming a requisite mental state for a charged offense.  *Id.* at 540, 931 P.2d at 1050; *see Clark v. Arizona*, 548 U.S. 735 (2006) (upholding the constitutionality of the *Mott* rule and finding that the exclusion of expert testimony regarding diminished capacity does not violate due process).

Arizona law does permit a defendant to present evidence that he has a *character trait* for acting reflexively, rather than reflectively, for the purpose of negating a finding of premeditation.  *See Christensen*, 129 Ariz. at 35-36, 628 P.2d at 583-84; *Vickers v. Ricketts*, 798 F.2d 369, 371 (9th Cir. 1986).  The *Christensen* rule is limited, however, in that an expert cannot testify as to whether the defendant was acting impulsively at the time of the

offense. *Id.* at 35-36, 628 P.2d at 583-84; *see also State v. Arnett*, 158 Ariz. 15, 22, 760 P.2d 1064, 1071 (1988) (emphasizing that although expert testimony is admissible to establish personality trait of acting without reflection, testimony of a defendant's probable state of mind at time of the offense is not permitted); *State v. Rivera*, 152 Ariz. 507, 514, 733 P.2d 1090, 1097 (1987) (same). Therefore, expert testimony of the type Petitioner faults counsel for failing to obtain could not have addressed Petitioner's alleged inability to form the requisite mental state, *State v. Schantz*, 98 Ariz. 200, 212-13, 403 P.2d 521, 529 (1965), or his probable state of mind at the time of the offense, *Christensen*, 129 Ariz. at 35-36, 628 P.2d at 583-84.

Finally, the failure to more fully pursue impulsivity as a defense was not unreasonable because there was no evidence that the killings were impulsive rather than premeditated. Thus, even if counsel had retained an expert to testify about Petitioner's alleged character trait of impulsivity, there was no reasonable probability of a different verdict on the murder counts.

In Arizona, first degree murder is distinguished from the lesser-included offense of second degree murder only by the element of premeditation. *Christensen*, 129 Ariz. at 35, 628 P.2d at 583. A defendant kills with premeditation if he "acts with either the intention or knowledge that he will kill another human being, when such intention or knowledge precedes the killing by a length of time to permit reflection." A.R.S. § 13-1101(1) (West 1978). "An act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion." *Id.*

In denying defense counsel's request for a second degree murder instruction, the trial court cited the numerous circumstances indicating that the all of the murders were premeditated. (RT 3/6/98 at 114-16.) First, the court noted that Petitioner engaged in a sustained struggle with Robert Delahunt, during which the victim "was still moving, he was still gurgling, he was still saying things" and that Petitioner, though his confession indicated that he initially did not want to kill Delahunt, "obviously changed his mind at some point and

began a course of conduct that was focused upon one and only one goal, and that was to obliterate Robert Delahunt as a person." (*Id.* at 115.) Addressing the additional murders, the court explained:

> with Leta Kagen the evidence is basically that they talked about it beforehand, he got the gun, he went to get the bullets, basically went in and shot and killed a person as they slept, or as they awoke from sleep, and that was the goal.
>
> He immediately reloaded, shot another person [Wear], and then the same process with Mr. Delahunt began over again, a series of assaults that were committed upon him which did not cease until he was dead, which of course was the plan that had been discussed initially.

(*Id.* at 115-16.) Based on this evidence, the court stated, "I just cannot see how anyone can look at that statement by the Defendant and find an issue on premeditation that would justify the giving of a second degree murder instruction." (*Id.* at 16.)

This Court agrees with the trial court's assessment of the evidence. The murders were part of the plan devised by Petitioner and Anderson to kill the residents and take Wear's truck. They were the product of deliberation and took place over the course of several hours. Thus, the circumstances of the murders clearly indicate that they were preceded by actual reflection as required for a showing of premeditation.

There is no reasonable probability the jury would have acquitted Petitioner of first degree murder had trial counsel introduced evidence of neurological impairment and an impulsive personality. No expert would have been allowed to testify that Petitioner was acting impulsively at the time of the murder. *Christensen*, 129 Ariz. at 35-36, 628 P.2d at 583-84. Rather, the testimony "would have been limited to a general description of [Petitioner's] behavioral tendencies." *Summerlin v. Stewart*, 341 F.3d 1082, 1095 (9th Cir. 2003) (en banc), *rev'd on other grounds,* 542 U.S. 348 (2004). As such, it would have had little or no probative value in determining whether Petitioner lacked premeditation at the time of the offense, particularly in light of the evidence that the murders were planned beforehand. Finally, the record does not support Petitioner's argument that an expert opinion about Petitioner's impairment and impulsivitiy would have convinced the judge to instruct the jury

on second degree murder.

*Involuntary confession expert*

With respect to defense counsel's failure to obtain an expert on involuntary confessions, the PCR court determined that Petitioner failed to make a colorable claim under *Strickland*:

> The Defendant has failed to establish what such an expert would have found regarding his manner of reacting to coercion or persuasion in a custodial interrogation setting. Since no showing has been made as to what any such experts would have been able to testify to, it is impossible to determine that failing to hire them in the first place could be ineffectiveness under the second prong of the <u>Strickland</u> test. There has been presented to the Court no more evidence now that the Defendant's confession was involuntary than there was at the voluntariness trial or at trial.

(Dkt. 31, Ex. N at 18-19.)

This was a reasonable application of *Strickland*. Petitioner presented nothing but speculation to support his argument that an expert on coerced confessions could have been retained and would have testified that Petitioner's confession was involuntary. As already noted, this is insufficient to establish prejudice under *Strickland*. *See Wildman*, 261 F.3d at 839; *Grisby*, 130 F.3d at 373; *Evans*, 285 F.3d at 377.

<u>Voir dire</u>

Petitioner claims that trial counsel performed ineffectively by failing to move for mistrial based on a venire member's prejudicial statement. (Dkt. 27 at 66-67.)

During voir dire, a prospective juror stated, in the presence of the entire panel, that she was employed by Child Protective Services and was aware that another CPS agent had previously examined the victims' home. (RT 3/2/98 at 157-58.) Based on this knowledge, the prospective juror indicated that she had formed an opinion about the case which she would be unable to set aside. (*Id.* at 158.) The court excused her. (*Id.* at 159-60.)

In his PCR petition, Petitioner alleged that trial counsel performed ineffectively by failing to move for a mistrial. (Dkt. 31, Ex. J at 16-17.) The court rejected the allegation, finding that "[t]rial counsel was not ineffective for failing to request a mistrial . . . because

any such request would have been denied by this Court." (Dkt. 32, Ex. N at 8.) The court further explained:

> The issue is whether [the prospective juror's] comments contaminated the other jurors by providing them unsworn information about the case. Other than the fact CPS had done an investigation, it is hard to tell what facts the excused juror conveyed to the other jurors. The juror did not say what information he learned from his colleague, why he would be unable to set it aside, and whether the opinion he formed was that the Defendant was or was not guilty. The statements by the juror were no more likely to contaminate the panel than were similar statements by jurors who had been exposed to media coverage of the case. . . . Perhaps one could argue that the panel might place greater emphasis on information gained through a governmental agency than through the media, although the Court wonders whether the average citizen in Arizona finds CPS more or less trustworthy than the media.

(*Id.* at 7-8.)

This ruling was not an unreasonable application of *Strickland*. Counsel's performance was not ineffective. The potential juror's remarks were not so prejudicial as to taint the entire panel; therefore, as the PCR court stated, even if counsel had moved for a mistrial, the motion would not have been granted.

The Arizona Supreme Court addressed a similar scenario in *State v. Doerr*, 193 Ariz. 56, 61-62, 969 P.2d 1168, 1173-74 (1998). In *Doerr*, a prison guard and a former crime lab specialist were among the panel members for a murder trial. *Id.* During voir dire, the guard remarked that while on the job he had encountered only three inmates who were not guilty, while the crime lab specialist commented that he could not be fair to the defense because he highly respected some of the State's witnesses. *Id.* Both panel members were excused for cause. *Id.* The defendant's motion for a mistrial was denied. *Id.* On appeal, the Arizona Supreme Court denied relief because there was no evidence that the panel was prejudiced. *Id.* at 62, 969 P.2d at 1174. The court observed that the statements merely expressed personal biases; they could not "reasonably be considered inflammatory" and "did not comment on the defendant's guilt or innocence"; and the judge had instructed the jurors to base their verdict only on the evidence presented at trial. *Id.* The court also noted that the trial judge "was in the best position to assess [the comments'] impact on the jurors." *Id.*

All of these factors apply in Petitioner's case. The CPS worker's comments were not inflammatory; they were ambiguous and at most expressed an undefined personal bias. The judge instructed the jury to "determine the facts only from the evidence produced in court." (RT 3/9/98 at 87.) The judge found no indication that the comments contaminated the jury. Nor were the comments likely to have affected the jury's decision, given the nature of the evidence against Petitioner, namely his own detailed confession to the crimes. Under these circumstances, and taking into account the judge's explicit statement that such a motion would have been denied, trial counsel's failure to move for a mistrial did not constitute ineffective assistance.

Conclusion

The PCR court's denial of these claims did not constitute an unreasonable application of *Strickland*. Therefore, Claims 5(A), 5(B), and 5(E) are denied.

**Claim 7**

Petitioner alleges that he received ineffective assistance of appellate counsel. (Dkt. 27 at 74.) Specifically, he cites appellate counsel's failure to challenge (A) the jury selection procedure, (B) the "mere presence" jury instruction, and (C) the trial court's consideration of victim impact evidence.

The Fourteenth Amendment guarantees a criminal defendant the effective assistance of counsel on his first appeal as of right. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). A claim of ineffective assistance of appellate counsel is reviewed under the standard set out in *Strickland. See Miller v. Keeney*, 882 F.2d 1428, 1433-34 (9th Cir. 1989). A petitioner must show that counsel's appellate advocacy fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's deficient performance, the petitioner would have prevailed on appeal. *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *see Miller*, 882 F.2d at 1434 n.9 (citing *Strickland*, 466 U.S. at 688, 694).

"A failure to raise untenable issues on appeal does not fall below the *Strickland* standard." *Turner v. Calderon*, 281 F.3d 851, 872 (9th Cir. 2002); *see also Wildman v.*

*Johnson*, 261 F.3d 832, 840 (9th Cir. 2001) (appellate counsel could not be found to have rendered ineffective assistance for failing to raise issues that "are without merit"); *Boag v. Raines*, 769 F.2d 1341, 1344 (9th Cir. 1985). No does appellate counsel have a constitutional duty to raise every nonfrivolous issue requested by a petitioner. *Miller*, 882 F.2d at 1434 n.10 (citing *Jones v. Barnes*, 463 U.S. 745, 751-54 (1983)); *see Smith v. Stewart*, 140 F.3d 1263, 1274 n.4 (9th Cir. 1998) (counsel not required to file "kitchen-sink briefs" because doing so "is not necessary, and is not even particularly good appellate advocacy"). Courts have frequently observed that the "weeding out of weaker issues is . . . one of the hallmarks of effective appellate advocacy." *Miller*, 882 F.2d at 1434; *see Smith v. Murray*, 477 U.S. 527, 536 (1986). Therefore, even if appellate counsel declines to raise weak issues, he will likely remain above an objective standard of competence and will have caused no prejudice. *Id.*

The PCR court found that Petitioner failed to show he was prejudiced by appellate counsel's performance. (Dkt. 32, Ex. N at 8-12, 25, 26-27.) This ruling did not constitute an unreasonable application of *Strickland*. As described below, the issues appellate counsel failed to raise are without merit. Therefore, Petitioner has not met his burden of affirmatively proving that he was prejudiced by appellate counsel's performance.

Jury selection

In his PCR petition, Petitioner alleged that appellate counsel was ineffective for failing to raise several challenges to the jury selection procedures used at trial, including the court's failure to utilize a jury questionnaire or allow individualized voir dire. (Dkt. 31, Ex. J at 18-22.)

Citing pretrial publicity, defense counsel requested that the court use a juror questionnaire during voir dire. (ROA doc. 49.) The trial judge denied the request, explaining that he had experience in high profile murder cases and believed he was capable of conducting a fair and thorough voir dire without the use of a questionnaire. (RT 2/4/98 at 18-19.) The judge characterized the use of questionnaires as a time-consuming process

that was not likely to result in more openness in the juror's responses; he also noted that the use of a questionnaire was not required by the rules or case law. (*Id.*)

During voir dire, the judge allowed counsel to ask questions of the panel members, but did not allow questions he found argumentative or irrelevant to the issues in the case. (RT 3/2/98 at 185-87, 203-05.) The judge himself questioned the panel extensively on their exposure to pretrial publicity. (*Id.* at 40-97.) Prior to doing so, he explained the purpose of his questions:

> I am going to be attempting to find out at this time what any of you know or think you know or may have heard or read about this case. And at some point I am going to be asking for a show of hands. I want to make sure that you all understand that I am going to be phrasing the questions to you in a way that is going to attempt to minimize the possibility that any one of you will blurt out something that you know about this case that I don't want the other 114 people to know about this case.
>
> So, please, when I ask you the questions don't volunteer any information to me. I will try to be asking you very limited questions. If any of you have some further information that I need to develop I will try to do that through my questions. I particularly don't want you to volunteer any information. And if it becomes necessary, we will be talking to some of you individually without all of the other jurors being present.

(*Id.* at 40.) The judge continued, "The test is going to be whether you can put aside anything that you may have been exposed to about this case and make a decision on the guilt or innocence of the Defendant . . . based solely on the evidence presented in court." (*Id.* at 42.) The judge proceeded to ask the panel about their exposure to media coverage of the case, questioning individual jurors who indicated that they had read or heard about the case, and excusing those who stated that they could not set aside such information and serve as impartial jurors. (*See id.* at 42-82.)

As previously noted, Petitioner did not challenge the voir dire process on appeal. The PCR court ruled that appellate counsel's omission of the issue did not state a colorable claim for relief. (Dkt. 32, Ex. N at 12.) The court explained:

> The first sub-issue raised by the Defendant regarding the jury selection process is the Court's refusal to use a jury questionnaire. Rule 18.5(d), Arizona Rules of Criminal Procedure, provides that the rule does not preclude the use of written questionnaires to be completed by the prospective jurors in

addition to oral examination. This rule clearly does not mandate the use of a questionnaire. The Court is unaware of any appellate decision, and the defense has cited none which has found the refusal to use a juror questionnaire to be error. . . . Arguing this issue on appeal would not have resulted in any relief, so the failure to argue it was not ineffective assistance.

The second sub-issue raised by the Defendant regarding the jury selection process is the Court's refusal to question prospective jurors individually. The position of the defense apparently is that the Court should have called and sworn one prospective juror at a time and questioned each out of the presence of the remaining prospective panel. Such a procedure is not required or even contemplated under Rule 18. The Court has no doubt that it has the discretion to utilize such a procedure where necessary to protect contamination of the entire panel, but there is no indication that any such contamination occurred in this case. The process used in this case was similar to that used in State v. Trostle, 191 Ariz. 4 (1997). The Arizona Supreme Court found that process to be acceptable, although perhaps not the best possible. . . . . Arguing this issue on appeal would not have resulted in any relief, so the failure to argue it was not ineffective assistance.

The third sub-issue raised by the Defendant . . . is what counsel characterizes as the Court's refusal to allow any questioning by trial counsel of either individual jurors or the entire seated panel. . . . That is not the Court's recollection. . . . What the Court recalls happening, and what the citations by the State confirm, is that the Court allowed trial counsel to ask questions of individuals and the panel but exercised its authority under Rule 18.5(d) to impose reasonable limitations with respect to questions allowed or to limit voir dire on grounds of abuse. . . . Arguing this issue on appeal would not have resulted in any relief, so the failure to argue it was not ineffective assistance.

The fourth sub-issue . . . is the refusal to allow sequestered follow-up questions of certain jurors. . . . The Court thinks [Petitioner's counsel] is arguing that it should have allowed trial counsel to question individual jurors separately regarding pretrial publicity. The State has addressed this issue as if it were the broader issue of failing to raise pretrial publicity. . . . Assuming that the Court's assessment of the issue being raised is more accurate than the State's, this is an aspect of the jury selection process that it would do differently today. However, it is an aspect which appears to have been condoned, albeit tepidly, by the Trostle court. . . . Assuming the State's response more accurately assessed the issue being raised by the defense, the record should reflect that the jury eventually selected to try this case was made up of either persons who knew nothing about the case or persons whose prior knowledge would not prevent them from being fair and impartial jurors. Arguing this issue on appeal, whether the issue was as perceived by the Court or the State, would not have resulted in any relief, so the failure to argue it was not ineffective assistance.

(Id. at 10-12.)

This ruling does not represent an unreasonable application of *Strickland*. Appellate

counsel's failure to raise the claim was not prejudicial because the claim is not meritorious.

While there is no Supreme Court precedent specifically addressing the use of juror questionnaires, clearly established Supreme Court law requires that a defendant be provided adequate voir dire such that unqualified jurors can be identified and the defendant can be tried by an impartial jury. *See Morgan v. Illinois*, 504 U.S. 719, 729 (1992). The Constitution does not dictate the format voir dire must take or specific questions that must be asked, and the trial judge has great discretion in how voir dire is conducted. *Id*. Failure to ask specific questions in voir dire only violates the Constitution if it renders the trial fundamentally unfair. *Mu'Min v. Virginia*, 500 U.S. 415, 425-26 (1991). Petitioner has made no showing that the questions the court did not allow defense counsel to ask rendered Petitioner's trial fundamentally unfair.[11]

Also, as the PCR court pointed out, the state supreme court in *State v. Trostle*, 191 Ariz. 4, 11-12, 951 P.2d 869, 876-77 (1997), denied relief on similar challenges to the voir dire process, stating that the trial court did not abuse its discretion in failing to use written questionnaires or question the jurors individually or in small groups. *Id.* The court noted that the trial judge "examined each person about his or her media exposure, memory of details, and ability to keep an open mind," that "[n]one of the jurors exhibited a closed mind," and "[a]ll stated that they could follow the court's instructions and decide the case on the evidence." *Id.* at 12, 951 P.2d at 877. Given this holding, which upheld the same procedures used in Petitioner's trial, there is no reasonable probability that Petitioner's appeal would have succeeded had counsel raised the issue.

"Mere presence" jury instruction

The trial court instructed the jury: "The Defendant's guilt cannot be established by his mere presence at a crime scene or mere association with another person at a crime scene.

---

[11] Defense counsel attempted to ask, and the court disallowed, questions such as the following, put to an individual juror: "when you hear things like a 15-year old boy was beaten, had a knife driven through his ear, what kind of reaction does that trigger?" (RT 3/2/98 at 186.)

- 44 -

The fact that the Defendant may have been present does not in and of itself make the Defendant guilty of the crime charged." (RT 3/9/98 at 96.) The court declined to provide the instruction proffered by defense counsel.[12] Appellate counsel did not raise the issue. The PCR court rejected Petitioner's argument that this constituted ineffective assistance, explaining: "There was no evidence at trial indicating that the Defendant was a mere bystander to the murderous acts of others. He was an active participant in the killing of 3 people. Failure to argue the propriety of the mere presence instruction on appeal was not ineffective because doing so would not have been successful." (Dkt. 32, Ex. N at 25.)

The PCR court's ruling was not an unreasonable application of *Strickland.* Petitioner cannot show he was prejudiced by appellate counsel's failure to challenge the premeditation instruction because the instruction was unobjectionable under Arizona case law. *State v. Prasertphong*, 206 Ariz. 70, 89, 75 P.3d 675, 694 (2003), *judgment vacated and case remanded on other grounds,* 541 U.S. 1039 (2004) (noting that the instruction correctly stated the law and rejecting defendant's argument that instruction "was constitutionally infirm because it did not reflect that he did not knowingly participate in the crimes and did not express that mere association is insufficient for guilt"). Therefore, there was no probability that raising the issue would have resulted in a different outcome on appeal.

Victim impact evidence

Petitioner contends that appellate counsel performed ineffectively in failing to

---

[12]     Defense counsel submitted the following instruction:

    Guilt cannot be established by the defendant's mere presence at a crime scene, *even with the knowledge that a crime is occurring*, or by mere association with another person at a crime scene. The fact that the defendant may have been present does not in and of itself make the defendant guilty of the crime charged.

(ROA doc. 80 (emphasis added).)

challenge the trial court's consideration of victim impact evidence when sentencing

Petitioner to death. The PCR court rejected this claim:

> Statements on behalf of the victims were included in the presentence report and were read and considered by the Court prior to sentencing. The Defendant in this case was convicted of non-capital offenses for which determinate sentences of specific years had to be imposed. A sentencing court in doing so may properly consider victim impact evidence. Such evidence may also be considered to rebut mitigating evidence offered by the defense, although the Court does not recall doing so in this case. More to the point, there is no indication in the Court's special verdict that it improperly considered statements on behalf of the victims in determining whether the State had proven beyond a reasonable doubt the capital aggravating factors, several of which were supported by overwhelming evidence. Appellate counsel would not have been successful raising this issue on appeal and failing to do so did not render him ineffective.

(Dkt. 32, Ex. N at 26-27.)

The PCR court applied *Strickland* reasonably in rejecting this claim. In *Payne v. Tennessee*, 501 U.S. 808, 827 (1991), the United States Supreme Court held that while a state may permit the admission of victim impact evidence, it is not allowed to present evidence concerning a victim's opinion about the appropriate sentence. Judges are presumed to know and follow the law, *Walton v. Arizona*, 497 U.S. 639, 653 (1990), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002), and here the trial judge did not cite the victim's opinions as a reason for imposing the death penalty. *See Gretzler v. Stewart*, 112 F.3d 992, 1009 (9th Cir. 1997) ("in the absence of any evidence to the contrary, [the Court] must assume that the trial judge properly applied the law and considered only the evidence he knew to be admissible"); *State v. Gulbrandson*, 184 Ariz. 46, 66, 906 P.2d 579, 599 (1995) ("[W]e generally have assumed that trial judges are capable of focusing on the relevant sentencing factors and ignore any "irrelevant, inflammatory, and emotional" statements when making the sentencing decision. We will do so again in this case because nothing in the record indicates that the trial judge gave weight to the victims' statements.") (citations omitted); *State v. Bolton*, 182 Ariz. 290, 315-16, 896 P.2d 830, 855-56 (1995). Thus, there was no basis on which to assert a *Payne* violation and there is no reasonable probability that

the Arizona Supreme Court would have granted relief had counsel raised the claim on appeal.

Conclusion

Because the claims appellate counsel failed to raise are without merit, Petitioner cannot show a reasonable probability that he would have prevailed on appeal if they had been raised. Therefore, he has failed to show that he was prejudiced by appellate counsel's performance and he is not entitled to relief on Claim 7.

**Claim 8**

Petitioner alleges that his constitutional rights were violated by the cumulative impact of the ineffective performance of trial and appellate counsel. (Dkt. 27 at 77.) Respondents counter that the claim is unexhausted and procedurally barred because it was not raised in state court. The Court agrees. The claim is also meritless. As set forth above, Petitioner has failed to prove he was prejudiced by any of counsel's alleged deficiencies. Where there is no prejudice from the individual alleged deficiencies, there can be no cumulative prejudicial effect. *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002). Claim 8 is denied.

**Claim 9**

Petitioner alleges that Arizona's death penalty statute is unconstitutional because it does not sufficiently channel the sentencer's discretion and fails to provide objective standards for weighing aggravating and mitigating circumstances. (Dkt. 27 at 78.) This claim is meritless. Rulings of both the Ninth Circuit and the United States Supreme Court have upheld Arizona's death penalty statute against allegations that particular aggravating factors do not adequately narrow the sentencer's discretion. *See Lewis v. Jeffers*, 497 U.S. 764, 774-77 (1990); *Walton*, 497 U.S. at 649-56; *Woratzeck v. Stewart*, 97 F.3d 329, 335 (9th Cir. 1996).

**Claim 10**

Petitioner alleges that the Arizona Supreme Court erred in its application of the cruel, heinous or depraved aggravating factor. (Dkt. 27 at 82.)

<u>Background</u>

The trial court determined that the murders of Delahunt and Wear were especially cruel and thus satisfied the aggravating factor set forth in A.R.S. § 13-703(F)(6). The court made the following findings:

> The testimony, I think, was very clear that as to Robert Delahunt and Roland Wear, they were eventually killed only after a protracted and horrible struggle had taken place in which the two of them were literally fighting for their lives; a fight which they eventually lost, and it's very clear that each of them maintained consciousness for a considerable period of time. Robert Delahunt, after having his throat slashed. Roland Wear, after actually having been shot, and having a struggle.
>
> It is indisputable that the two of them have to have suffered physical pain, have to have realized, at some point, that the struggle was going to continue until they were dead, and they had to have been literally looking at death in the eye, knowing that that was coming for a considerable period of time.

(RT 11/20/98 at 43-44.)

The Arizona Supreme Court affirmed the trial court's findings, noting that "the State proved beyond a reasonable doubt that Delahunt and Wear engaged in protracted struggles for their lives, during which they undoubtedly experienced extreme mental anguish and physical pain." *Poyson*, 198 Ariz. at 78, 7 P.3d at 87. The court elaborated:

> The existence of mental distress is apparent from the length of time during which both victims fought off the attacks of the defendant and Frank Anderson, as well as the victims' statements during the attacks. After Delahunt's throat was slashed, he struggled with Anderson and the defendant for some forty-five minutes before dying. He had two defensive wounds on his left hand, confirming that he was conscious throughout the ordeal. *See Medrano*, 173 Ariz. at 397, 844 P.2d at 564; *State v. Amaya-Ruiz*, 166 Ariz. 152, 177, 800 P.2d 1260, 1285 (1990). According to the defendant's confession, Delahunt repeatedly asked why he and Anderson were trying to kill him. Likewise, after being shot in the mouth, Wear fought with Poyson and Anderson for several minutes before he died. During the attack, Wear begged the defendant not to hurt him, saying "Bobby, stop. Bobby don't. I never did anything to hurt you." In our view, it is beyond dispute that these victims suffered unspeakable mental anguish. *See Medina*, 193 Ariz. at 513, 975 P.2d at 103 (concluding that victim's cries of "Please don't hit me. Don't hit me. Don't. Don't," evidenced both physical and mental pain and suffering); *State v. Rienhardt,* 190 Ariz. 579, 590, 951 P.2d 454, 455 (1997) (upholding cruelty finding where victim experienced twenty minute ride to the desert after being told he would be killed, and made statements revealing that he feared for his life).

- 48 -

Clearly, the victims also suffered severe physical pain. Delahunt's throat was slashed by Anderson. Defendant then slammed the victim's head against the floor and pounded it with a rock. Later, he drove a knife into Delahunt's ear while the boy was still conscious and struggling. Similarly, Wear suffered a gunshot wound to the mouth that shattered several of his teeth. He was then struck in the head numerous times with a rifle. Like Delahunt, he was conscious during much of the attack. Thus, the State proved beyond a reasonable doubt that the victims suffered great physical pain before their deaths. *See State v. Apelt (Michael)*, 176 Ariz. 349, 367, 861 P.2d 634, 652 (1993) (affirming cruelty finding where victim was conscious when struck repeatedly with great force, stabbed in the back and chest, and her throat was slashed); *State v. Brewer*, 170 Ariz. 486, 501, 826 P.2d 783, 799 (1992) (upholding cruelty finding where victim was conscious during forty-five minute attack).

*Id..* at 78-79, 7 P.3d at 87-88.

<u>Analysis</u>

With respect to a state court's application of an aggravating factor, habeas review "is limited, at most, to determining whether the state court's finding was so arbitrary and capricious as to constitute an independent due process or Eighth Amendment violation." *Jeffers*, 497 U.S. at 780. In making that determination, the reviewing court must inquire "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found that the factor had been satisfied." *Id.* at 781 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319.

The especially cruel prong of (F)(6) addresses the suffering of the victim. *See State v. Murray*, 184 Ariz. 9, 37, 906 P.2d 542, 570 (1995). Thus, "a crime is committed in an especially cruel manner when the [defendant] inflicts mental anguish or physical abuse before the victim's death." *State v. Walton*, 159 Ariz. 571, 586, 769 P.2d 1017, 1032 (1993). Petitioner contends that there was insufficient evidence to support a finding that Delahunt and Wear experienced either mental anguish or physical suffering prior to their deaths. First, citing *State v. Schackart*, 190 Ariz. 238, 248, 947 P.2d 315, 325 (1997), Petitioner argues that

the victims did not suffer mentally because they did not experience "significant uncertainty" about their ultimate fate; in Petitioner's view, any anxiety they otherwise would have experienced during their ordeal was ameliorated by the fact that they knew they would be killed. (Dkt. 27 at 83.) Thus, according to Petitioner, Delahunt, having overheard the conversation between his prospective killers, "knew of the conspiracy to kill him" and therefore "when Anderson and Petitioner attacked him, Delahunt could have been reasonably confident that the attack would end in his death." (*Id.*) Likewise, Wear, having just witnessed his lover being shot to death in their bed, "could have been reasonably confident that the attack on him would end in his death as well." (*Id.* at 84.)

As a factual matter, the Court is skeptical that either victim, while fighting for his life against two brutal attackers, experienced an appreciable reduction in mental suffering by being spared confusion as to the outcome of the battle. As a legal matter, the fact that Delahunt and Wear understood the stakes and the probable result of the attacks does not foreclose a finding of mental anguish. "Evidence about '[a] victim's *certainty or uncertainty* as to his or her ultimate fate can be indicative of cruelty and heinousness.'" *State v. Kemp*, 185 Ariz. 52, 65, 912 P.2d 1281, 1294 (1996) (quoting *State v. Gillies*, 142 Ariz. 564, 569, 691 P.2d 655, 660 (1984) (emphasis added)). In any event, the Court finds, as did the Arizona Supreme Court, that both Delahunt and Wear, notwithstanding Petitioner's assertion that they had received adequate notice of their ultimate fate, clearly manifested signs of mental anguish when they pleaded for mercy.

Even if Delahunt and Wear did not experience mental anguish when they were being stabbed, shot, and beaten to death, there is no doubt that Petitioner subjected both victims to appalling physical cruelty. Petitioner argues that the victims were not conscious during this abuse and therefore did not suffer. This is directly contrary to the evidence. As already noted, both victims cried out to Petitioner in the midst of the attacks, clearly indicating that they were conscious when they suffered a number of their wounds. While each victim may have been rendered unconscious by the blows to the head which ultimately killed them, prior

to receiving those fatal injuries they suffered grievous wounds during their struggles against Petitioner. After Anderson slashed Delahunt's throat, Petitioner slammed his head into the floor, struck his head with a rock and a cinder block, and pounded a knife through his ear. The violence continued for a period of 45 minutes, precisely because Delahunt continued to struggle. Petitioner shot Wear in the mouth then clubbed him repeatedly with the rifle; Wear continued to struggle and was knocked to the ground by a cinder block thrown by Anderson; Petitioner kicked Wear in the head and finally killed him by throwing the cinder block at his head several times.

A reasonable factfinder could have determined that the murders were especially cruel. Claim 10 is denied.

**Claim 11**

Petitioner alleges that he was denied his constitutional right to voir dire the trial judge concerning his views on the death penalty. (Dkt. 27 at 86.) The Arizona Supreme Court's rejection of this claim, *Poyson*, 198 Ariz. at 83, 7 P.3d at 92, was neither contrary to nor an unreasonable application of clearly established federal law.

Petitioner cites no authority in support of this claim. Although the Constitution requires that a defendant receive a fair trial before a fair and impartial judge with no bias or interest in the outcome, *see Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997), trial judges, like other public officials, operate under a presumption that they properly discharge their official duties. *See United States v. Armstrong*, 517 U.S. 456, 464 (1996); *see also State v. Perkins*, 141 Ariz. 278, 286, 686 P.2d 1248, 1256 (1984) (trial judge is presumed to be free of bias and prejudice). The presumption of regularity applies absent clear evidence to the contrary. *See Armstrong*, 517 U.S. at 464; *see also State v. Rossi*, 154 Ariz. 245, 248, 741 P.2d 1223, 1226 (1987) (mere possibility of bias or prejudice does not entitle a criminal defendant to voir dire the trial judge at sentencing). Petitioner made no allegation of bias or prejudice when he raised this issue before the Arizona Supreme Court (*see* Opening Br. at 38) and makes no such allegation here (Dkt. 27 at 86-87). Claim 11 is denied.

**Claim 12**

Petitioner alleges that Arizona's death penalty scheme discriminates against poor young males. (Dkt. 27 at 87.) This claim, which the Arizona Supreme Court rejected on appeal, *Poyson*, 198 Ariz. at 83, 7 P.3d at 92, is meritless. Clearly established federal law holds that "a defendant who alleges an equal protection violation has the burden of proving 'the existence of purposeful discrimination'" and must demonstrate that the purposeful discrimination "had a discriminatory effect" on him. *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987) (quoting *Whitus v. Georgia*, 385 U.S. 545, 550 (1967)). Therefore, to prevail on this claim, Petitioner "must prove that the decisionmakers in *his* case acted with discriminatory purpose." *Id.* Petitioner does not attempt to meet this burden. He offers no evidence specific to his case that would support an inference that his sex, age, or economic status played a part in his sentence. *See Richmond v. Lewis*, 948 F.2d 1473, 1490-91 (1990), *vacated on other grounds*, 986 F.2d 1583 (9th Cir. 1993) (holding that statistical evidence that Arizona's death penalty is discriminatorily imposed based on race, sex, and socio-economic background is insufficient to prove that decisionmakers in petitioner's case acted with discriminatory purpose).

**Claim 13**

Petitioner alleges that Arizona's death penalty scheme is unconstitutional because the prosecutor's discretion to seek the death penalty is "limitless, standardless and arbitrary." (Dkt. 27 at 89.) This claim is meritless. In *Smith v. Stewart*, 140 F.3d 1263, 1272 (9th Cir. 1998), the Ninth Circuit disposed of the argument that Arizona's death penalty statute is constitutionally infirm because "the prosecutor can decide whether to seek the death penalty." *See Gregg v. Georgia*, 428 U.S. 153, 199 (1976) (pre-sentencing decisions by actors in the criminal justice system that may remove an accused from consideration for the death penalty are not unconstitutional); *Silagy v. Peters*, 905 F.2d 986, 993 (7th Cir. 1990) (holding that the decision to seek the death penalty is made by a separate branch of the government and is therefore not a cognizable federal issue).

**Claim 14**

Petitioner alleges that Arizona's pecuniary gain aggravating factor, A.R.S. § 13-703(F)(5), is unconstitutional because it fails to narrow the class of death-eligible defendants. (Dkt. 27 at 91.) He also argues that the factor was not proven in his case. (*Id.* at 93.) Both arguments are without merit.

Rulings of the Ninth Circuit and the United States Supreme Court have upheld Arizona's death penalty statute against allegations that particular aggravating factors, including the pecuniary gain factor, do not adequately narrow the sentencer's discretion. *See Jeffers*, 497 U.S. at 774-77; *Walton*, 497 U.S. at 649-56; *Woratzeck*, 97 F.3d at 335. The Ninth Circuit has also explicitly rejected the contention that Arizona's death penalty statute is unconstitutional because it "does not properly narrow the class of death penalty recipients." *Smith*, 140 F.3d at 1272.

With respect to the application of the pecuniary gain factor to Petitioner's sentence, the trial court concluded that the State had proven that Petitioner committed the murders in order to gain something of pecuniary value, namely Wear's truck. (RT 11/20/98 at 42.) The court observed: "The fact is that the desire to get the means of transportation to get them out of Golden Valley and get to Chicago, or wherever it was that they were going, was the sole reason, the driving force behind the commission of these murders." (*Id.*) The Arizona Supreme Court agreed:

> In this case, the record is replete with evidence that the defendant and Anderson committed the murders in order to steal Roland Wear's truck. As soon as Anderson arrived in Golden Valley, he told the defendant that he was eager to leave. Two days later, the pair agreed to kill Delahunt, Wear and Kagen so that they could steal the truck and drive to Chicago. As Poyson admitted in his confession, this was the motive for the killings. This evidence is sufficient to support the pecuniary gain aggravator.

*Poyson*, 198 Ariz. at 78, 7 P.3d at 87.

"[A] finding that a murder was motivated by pecuniary gain for purposes of § 13-703(F)(5) must be supported by evidence that the pecuniary gain was the impetus of the murder, not merely the result of the murder." *Moormann v. Schriro*, 426 F.3d 1044, 1054

(9th Cir. 2005). A rational factfinder could have determined that Petitioner, after planning the crimes with Anderson, killed the victims in order to gain access to Wear's vehicle. A rational factfinder could reach such a determination because Petitioner confessed to doing precisely that. The record suggests no other motivation for the murders.

Petitioner contends that the murders were committed in order to prevent the victims from reporting the theft of the truck. (Dkt. 27 at 94.) This argument is unavailing. A "financial motive need not be the only reason the murder was committed for the pecuniary gain aggravator to apply." *State v. Kayer*, 194 Ariz. 423, 434, 984 P.2d 31, 42 (1999). The fact that the murders may have been motivated in part by the perpetrators' desire to eliminate witnesses does not foreclose a finding that the murders were committed for pecuniary gain. *State v. Greenway*, 170 Ariz. 155, 164, 823 P.2d 22, 31 (1991); *see State v. Jones*, 197 Ariz. 290, 309, 4 P.2d 345, 364 (2000) (factor satisfied where defendants "murdered the individuals to facilitate the robberies and then escape punishment"); *Trostle*, 191 Ariz. at 18, 951 P.2d at 883 (factor satisfied where defendant planned to steal a truck and "the victim was killed to delay reporting of the theft and to eliminate the only witness"). Here, the indisputable purpose of all of the killings was "to further the defendant's motive of pecuniary gain from the robbery." *Walton*, 159 Ariz. at 588, 769 P.2d at 1034.

Petitioner is not entitled to relief on Claim 14.

**Claim 15**

Petitioner alleges that Arizona's death penalty scheme is unconstitutional because it requires the sentencer to impose the death penalty whenever it finds an aggravating factor and no mitigating circumstances sufficient to warrant leniency. (Dkt. 27 at 89.) Respondents contend that the claim is unexhausted and procedurally barred. Regardless of its procedural status, the claim is plainly meritless and will be denied. *See* 28 U.S.C. § 2254(b)(2); *Rhines*, 544 U.S. at 277.

*Walton* rejected the claim that Arizona's death penalty statute is impermissibly mandatory and creates a presumption in favor of the death penalty because it provides that

the death penalty "shall" be imposed if one or more aggravating factors are found and mitigating circumstances are insufficient to call for leniency. 497 U.S. at 651-52 (citing *Blystone*, 494 U.S. 299; *Boyde*, 494 U.S. 370); *see Marsh*, 548 U.S. at 173-74 (relying on *Walton* to uphold Kansas's death penalty statute, which directs imposition of the death penalty when the state has proved that mitigating factors do not outweigh aggravators); *Smith*, 140 F.3d at 1272 (summarily rejecting challenges to the "mandatory" quality of Arizona's death penalty statute). Claim 15 is denied.

**Claim 16**

Petitioner alleges that Arizona's death penalty scheme is unconstitutional because it requires the State to prove only a defendant's eligibility for the death penalty as opposed to the appropriateness of the death penalty for that defendant. (Dkt. 27 at 96.) Respondents contend that the claim is unexhausted and procedurally barred. Regardless of its procedural status, the claim is plainly meritless and will be denied.

With respect to a capital defendant's eligibility for the death penalty, Arizona's statute complies with constitutional requirements by allowing only certain, specific aggravating circumstances to be considered. *See Blystone*, 494 U.S. at 306-07 ("The presence of aggravating circumstances serves the purpose of limiting the class of death-eligible defendants, and the Eighth Amendment does not require that these aggravating circumstances be further refined or weighed by [the sentencing authority]."). In addition to the requirements for determining eligibility for the death penalty, the Supreme Court has imposed a separate requirement for the selection decision, "where the sentencer determines whether a defendant eligible for the death penalty should in fact receive that sentence." *Tuilaepa*, 512 U.S. at 972. A statute which "provides for categorical narrowing at the definition stage, and for individualized determination and appellate review at the selection stage" will ordinarily meet constitutional concerns, *Zant*, 462 U.S. at 879, so long as a state ensures "that the process is neutral and principled so as to guard against bias or caprice," *Tuilaepa*, 512 U.S. at 973. As set forth above, Arizona's capital sentencing statute requires

the sentencing court to consider as mitigating circumstances "any factors proffered by the defendant or the state that are relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities or record and any of the circumstances of the offense." A.R.S. § 13-703(G). Moreover, each death sentence is independently reviewed by the Arizona Supreme Court, which reweighs the aggravating and mitigating factors to determine the propriety of the death sentence. *See, e.g.*, *Poyson*, 198 Ariz. at 81, 7 P.3d at 90 (citing former A.R.S. § 13-703.01(A)). Because it provides for "categorical narrowing" at the definition stage and for an "individualized determination" at the selection stage, Arizona's death penalty scheme is not unconstitutional. *See Walton*, 497 U.S. at 652. Petitioner's assertion that such an individualized consideration did not occur in his case is without support in the trial court's special verdict or the opinion of the Arizona Supreme Court. Claim 16 is therefore denied.

**Claim 17**

Petitioner alleges that his death sentences are unconstitutional because he was not afforded the procedural safeguard of proportionality review. (Dkt. 27 at 97.) This claim is meritless. There is no federal constitutional right to proportionality review of a death sentence, *McCleskey*, 481 U.S. at 306 (citing *Pulley v. Harris*, 465 U.S. 37, 43-44 (1984)), and the Arizona Supreme Court discontinued the practice in 1992, *State v. Salazar*, 173 Ariz. 399, 417, 844 P.2d 566, 584 (1992). The Ninth Circuit has explained that the interest implicated by proportionality review – the "substantive right to be free from a disproportionate sentence"– is protected by the application of "adequately narrowed aggravating circumstance[s]." *Ceja*, 97 F.3d at 1252. Claim 17 is denied.

**Claim 18**

Petitioner alleges that his death sentences are unconstitutional because a judge rather than a jury found the facts necessary for imposition of the death penalty. (Dkt. 27 at 100.) He also contends that his rights were violated because he did not receive notice of the aggravating factors in an indictment. (*Id.*) Both allegations are without merit.

First, in *Ring v. Arizona*, 536 U.S. 584 (2002), the Supreme Court held that aggravating factors that render a defendant eligible for the death penalty must be found by a jury. However, in *Schriro v. Summerlin*, 542 U.S. 348 (2004), the Court ruled that *Ring* does not apply retroactively to cases already final on direct review. Because direct review of Petitioner's case was final prior to *Ring*, he is not entitled to federal habeas relief premised on that ruling.

Next, while the Due Process Clause guarantees defendants a fair trial, it does not require states to observe the Fifth Amendment's provision for presentment or indictment by a grand jury. *Hurtado v. California*, 110 U.S. 516, 538 (1884); *Branzburg v. Hayes*, 408 U.S. 665, 688 n. 25 (1972). The Arizona Supreme Court has expressly rejected the argument that *Ring* requires that aggravating factors be alleged in an indictment and supported by probable cause. *McKaney v. Foreman*, 209 Ariz. 268, 270, 100 P.3d 18, 20 (2004). Petitioner cites no authority to the contrary. Claim 18 is denied.

**Claim 19**

Petitioner alleges that he is being denied a fair clemency process. (Dkt. 27 at 105.) In particular, he asserts the proceeding will not be fair and impartial based on the Clemency Board's selection process, composition, training, and procedures, and because the Attorney General will act as the Board's legal advisor and as an advocate against Petitioner. (Dkt. 27 at 105.)

This claim is meritless. First, because Petitioner has not sought clemency, the claim is premature and not ripe for adjudication. More significantly, however, the claim is not cognizable on federal habeas review. Habeas relief can only be granted on a claim that a prisoner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Petitioner's challenge to state clemency procedures does not constitute an attack on his detention and thus is not a proper ground for habeas relief. *See Franzen v. Brinkman*, 877 F.2d 26 (9th Cir. 1989); *see also Woratzeck v. Stewart*, 118 F.3d

648, 653 (9th Cir. 1997) (per curiam) (clemency claims are not cognizable under federal habeas law). Therefore, Claim 19 is dismissed.

**Claim 20**

Petitioner alleges, citing *Ford v. Wainwright*, 477 U.S. 399 (1986), that he is incompetent to be executed. (Dkt. 27 at 108.) This claim is not yet ripe for federal review. Under *Martinez-Villareal v. Stewart*, 118 F.3d 628, 634 (9th Cir. 1997), *aff'd,* 523 U.S. 637 (1998), a claim of incompetency for execution had to "be raised in a first habeas petition, whereupon it also must be dismissed as premature due to the automatic stay that issues when a first petition is filed." The Supreme Court revisited *Martinez-Villareal* and concluded in *Panetti v. Quarterman*, 551 U.S. 930 (2007), that it is unnecessary to raise unripe *Ford* claims in the initial habeas petition in order to preserve any possible unripe incompetency claim. *Id.* at 946-47. Thus, if this claim becomes ripe for review, it may be presented to the district court; it will not be treated as a second or successive petition. *See id.* Claim 20 is dismissed without prejudice as premature.

## EXPANSION OF THE RECORD

Petitioner seeks to expand the record to include a psychological report, dated May 18, 2009, prepared by Dr. Robert Smith. (Dkt. 72.) Dr. Smith, whose evaluation of Petitioner took place in October 2005, opines that "Mr. Poyson was, at the time of the instant offense, suffering from several psychological disorders, including Posttraumatic Stress Disorder, Dysthymic Disorder and Substance Dependence," that these "psychological disorders played a significant role in his involvement in the instant offense," and that the disorders "were magnified by the effects of the alcohol and drugs that he used, causing Mr. Poyson to be desperate, impulsive, aggressive, emotionally labile and illogical." (*Id.*, Ex. A at 15.) Petitioner indicates that the report is relevant to Claim 5(B), alleging ineffective assistance due to counsel's failure to obtain experts to assist in developing defenses to the charges against him. Respondents oppose the motion on the grounds that it is untimely, having been filed more than three and a half years after the deadline for motions for evidentiary

development, and because it fails to meet the requirements of 28 U.S.C. § 2254(e)(2).

The Court denied Petitioner's previous request for evidentiary development of Claim 5(B), which sought to expand the record to include evidence that Petitioner suffers from fetal alcohol syndrome, finding that Petitioner was not diligent in developing the factual basis of the claim in state court. (Dkts. 54 at 24-25, 66 at 8-11.) The same rationale applies to Petitioner's second motion to expand the record. Petitioner had an opportunity during the PCR proceedings to develop evidence that he suffers from posttraumatic stress disorder and the other conditions noted in Dr. Smith's report. His failure to do so constitutes a lack of diligence which precludes the Court from expanding the record. *See* 28 U.S.C. § 2254(e)(2); *Cooper-Smith v. Palmateer*, 397 F.3d 1236, 1241-42 (9th Cir. 2005).

## CONCLUSION

The Court finds that Petitioner has failed to establish entitlement to habeas relief on any of his claims. The Court further finds that Petitioner is not entitled to expansion of the record.

## CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11 of the Rules Governing § 2254 Cases, the Court has evaluated the claims within the petition for suitability for the issuance of a certificate of appealability (COA). *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Rule 22(b) of the Federal Rules of Appellate Procedure provides that when an appeal is taken by a petitioner, the district judge who rendered the judgment "shall" either issue a COA or state the reasons why such a certificate should not issue. Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will

issue only if reasonable jurists could debate whether the petition states a valid claim of the denial of a constitutional right and whether the court's procedural ruling was correct.  *Id.*

The Court finds that reasonable jurists could debate its resolution of Claims 2 and 3 on the merits and its dismissal of Claim 6 as procedurally barred.  For the reasons stated in this order, and in the order of July 25, 2006 (Dkt. 54), the Court declines to issue a COA with respect to any other claims.

Based on the foregoing,

**IT IS ORDERED** that Petitioner's Amended Petition for Writ of Habeas Corpus (Dkt. 27) is **DENIED**.  The Clerk of Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that Petitioner's motion for expansion of the record (Dkt. 72) is **DENIED**.

**IT IS FURTHER ORDERED** that the stay of execution entered by this Court on March 23, 2004 (Dkt. 3), is **VACATED.**

**IT IS FURTHER ORDERED GRANTING** a Certificate of Appealability as to the following issues:

Whether Claims 2 and 3 of the Amended Petition – alleging that Petitioner's rights were violated when the state courts applied a causal connection test to his mitigating evidence and refused to consider all of the mitigating evidence – are without merit.

Whether Claim 6 of the Amended Petition – alleging ineffective assistance of counsel at sentencing – is procedurally barred.

**IT IS FURTHER ORDERED** that the Clerk of Court forward a courtesy copy of this Order to the Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ 85007-3329.

DATED this 20th day of January, 2010.

_____
Neil V. Wake
United States District Judge